J-A15046-14

2014 PA Super 235

| THE VINCENT J. FUMO IRREVOCABLE CHILDREN'S TRUST FOR THE BENEFIT OF ALLISON FUMO | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: VINCENT J. FUMO | No. 2459 EDA 2013 |

Appeal from the Decree August 1, 2013
In the Court of Common Pleas of Philadelphia County Orphans' Court
At No. 1557(IV) of 2012

BEFORE:  PANELLA, LAZARUS AND JENKINS, JJ.

OPINION BY JENKINS, J.                  **FILED OCTOBER 17, 2014**

Vincent J. Fumo ("Father") appeals from a decree removing Anthony Repici, M.D. as trustee of a trust Father created for his daughter, Allison Fumo ("Daughter"), and appointing Sylvia DiBona as successor trustee of Daughter's trust.  After careful review, we affirm.

I.

Through a Trust Agreement created in 2006, Father created *inter vivos* irrevocable trusts for two of his children, Vincent E. Fumo, Jr. ("Son") and Allison Fumo ("Daughter"), so that they and their children could live comfortably.  Under the Trust Agreement, Son's and Daughter's trusts each became a 49.5% owner of the assets in the Fumo Family Limited Partnership ("FFLP").  Father named Roseanne Pauciello as the trustee of both trusts.

In 2009, Father was convicted of mail fraud and other offenses. In early 2010, shortly before going to federal prison, and faced with dwindling finances, Father obtained a $1.4 million loan from the FFLP with a repayment date of 2013. In 2011 and 2012, he modified the loan to extend the repayment date to 2040, when he will be 97 years old, and he then defaulted on the loan in its modified form.

On September 8, 2011, Pauciello announced that she was resigning as trustee. No one performed the duties of trustee between September 2011 and October 23, 2012, when, despite her prior resignation, Pauciello purported to appoint Samuel Bennett, the brother-in-law of Father's fiancé, as successor trustee.

On October 23, 2012, fearing that Bennett would not enforce repayment of the $1.4 million loan to the FFLP, Daughter filed a petition opposing Bennett's appointment as successor trustee and requesting termination of the trust. Daughter amended her petition twice in October and November of 2012. In response, Father and Bennett each appointed Anthony Repici, Father's longtime friend and personal physician, as successor trustee in place of Bennett.

On August 1, 2013, following an evidentiary hearing, the Orphans' Court entered a decree declaring Bennett's appointment of Repici null and void; declaring Father's appointment of Repici null and void; denying Father's motion to keep the record open so that he could testify in court

2

following his release from prison; and appointing Daughter's nominee, Sylvia DiBona, as successor trustee[1]. On August 29, 2013, Father filed a timely notice of appeal[2]. Without ordering Father to file a statement of matters complained of on appeal, the court filed a detailed opinion articulating its findings of fact and conclusions of law.

Father raises four arguments on appeal: (1) the Orphans' Court abused its discretion in nullifying Repici's appointment as successor trustee; (2) Daughter had no right to seek Repici's removal because her petitions only sought Bennett's removal as trustee; (3) the Orphans' Court improperly refused to keep the record open so that Father could testify in court following his release from prison; and (4) the court improperly overruled Father's preliminary objections to Daughter's second amended petition.

We hold that the Orphans' Court properly decreed Bennett's appointment of Repici null and void. The Trust Agreement required Pauciello to appoint a successor trustee within sixty days after she became unwilling to serve as trustee. Pauciello did not appoint Bennett as successor trustee until 13 months after she became unwilling to serve. Thus, Pauciello's

---

[1] The court also denied Daughter's request to terminate the trust. Neither Father nor Daughter has appealed this component of the decree.

[2] Orphans' Court Rule 7.1(a) permits, but does not require, the filing of exceptions "to any order, decree or adjudication which would become a final appealable order under Pa.R.A.P. 341(b) or Pa.R.A.P. 342 following disposition of the exceptions." Father elected not to file exceptions to the August 1, 2013 decree.

appointment of Bennett was a nullity, which in turn nullified Bennett's appointment of Repici.

Furthermore, the Orphans' Court properly decreed Father's appointment of Repici null and void. The Trust Agreement prohibits Father from serving as successor trustee. The Orphans' Court's opinion makes clear that it regards Repici as Father's alter ego due to their close, longtime friendship. It therefore was necessary to decree Repici's appointment a nullity to enforce the Trust Agreement's plain language and intent.

In addition, the Orphans' Court properly nullified Father's appointment of Repici under the doctrine of unclean hands. The Orphans' Court found, and the record confirms, that Father appointed Repici as part of his plan to thwart repayment of his loan to the FFLP. Although the Orphans' Court did not use the term "unclean hands," it obviously regarded Father as acting in this fashion. We do as well, since the evidence shows that Father appointed Repici to exalt his own interests over Daughter's.

Alternatively, the Orphans' Court properly removed Repici and appointed DiBona as successor trustee based on clear and convincing evidence of a "substantial change in circumstances." 20 Pa.C.S. § 7766(b)(4). Daughter proved that Repici's appointment was part of Father's plan to stymie repayment of his $1.4 million loan to the FFLP, and Repici is unqualified to serve as trustee due to his close ties with Father and his lack of expertise in trust administration. Conversely, DiBona, a CPA and

4

insurance broker as well as Daughter's godmother, is well qualified to administer the trust and can be counted on to protect Daughter's interests.

Finally, for the reasons provided below, we find no merit in the other arguments that Father raises on appeal.

II.

In an appeal from an Orphans' Court decree,

> [we] must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of that discretion. However, we are not constrained to give the same deference to any resulting legal conclusions. Where the rules of law on which the court relied are palpably wrong or clearly inapplicable, we will reverse the court's decree.

*In re Estate of Brown*, 30 A.3d 1200, 1206 (Pa.Super.2011) (citation omitted).

The Orphans' Court's decision to appoint or remove a trustee is subject to review for abuse of discretion. *In re Croessant's Estate*, 393 A.2d 443, 446 (Pa.1978); *Holmes Trust*, 139 A.2d 548, 551 (Pa.1958) ("the court may remove a trustee if his continuing to act as trustee would be detrimental to the interests of the beneficiary. The matter is one for the exercise of a reasonable discretion by the court"); *In Re Taylor's Estate*, 181 A. 482, 483 (Pa.1935) (appointment of successor trustee would not be disturbed on appeal in absence of abuse of discretion).

5

Moreover, the Orphans' Court may invoke the doctrine of unclean hands when considering whether to appoint or remove a trustee. *In Re Bosley*, 26 A.3d 1104, 1114 (Pa.Super.2011) (citing *Stauffer v. Stauffer*, 351 A.2d 236, 245 (Pa.1976)). The decision to apply the unclean hands doctrine against a party is subject to review for abuse of discretion. *Id*.

In addition, the Orphans' Court's decision to deny a continuance or to keep the record open is also subject to review for abuse of discretion. *In Re B.M.D.*, 424 A.2d 1278, 1280 n. * (Pa.1980) (reviewing Orphans' Court's decision to deny continuance for abuse of discretion).

### III.

The evidence credited by the Orphans' Court is as follows. Father is over seventy years old and is in poor health, having suffered multiple heart attacks, including one in the past several years[3]. On June 23, 2006, Father executed the Vincent J. Fumo Irrevocable Children's Trust Agreement ("Trust Agreement"), which created two *inter vivos*, irrevocable trusts, one for Son and one for Daughter[4]. Father's intent was to gift money in trust to Son and Daughter for their children "so that [they] would never have to suffer what he had suffered as a child"[5]. Under the Trust Agreement, each trust became owner of a 49.5% limited partnership interest in the Fumo Family Limited

---

[3] R. 513, 516 (Daughter's testimony).
[4] R.R. 563-585 (Trust Agreement).
[5] R.R. 511 (Daughter's testimony).

6

Partnership ("FFLP")[6]. The FFLP's general partner, Vincent J. Fumo General Partnership, Inc. ("VJFGP"), became owner of the remaining one percent[7].

Father is the sole shareholder and first president of VJFGP[8]. Father was succeeded as president by Andrew Cosenza, who in turn was replaced by Tom Myers, Father's friend[9]. Myers remains president today.

In 2007, the FFLP held approximately $3.2 million[10], giving Daughter's trust an interest of approximately $1.6 million.

Each child's trust was to dissolve on the child's 40th birthday. At the time of the creation of the Trust Agreement, Son was 37 years old, and Daughter was 16. When Son turned 40, his trust dissolved, and he received $533,000 in trust assets and personally took possession of his 49.5 percent interest in the FFLP[11]. Daughter's trust, however, did not receive a matching amount of $533,000. The FFLP's 2009-10 tax returns show only a payable to Daughter's trust in that amount[12].

In Paragraph 14 of the Trust Agreement, Father appointed Roseanne Pauciello, a longtime friend, as trustee of Son's and Daughter's trusts. Paragraph 14 continues:

---

[6] R.R. 563-585 (Trust Agreement).
[7] *Id*.
[8] R.R. 460 (Son's testimony).
[9] R.R. 463-64 (Son's testimony).
[10] R.R. 796 (exhibit entitled "topside summary of movement between accounts").
[11] R.R. 525 (testimony of Kirsten Flanagan, CPA).
[12] R.R. 525-26, 819 (2009 tax return), 900 (2010 tax return).

In the event ROSANNE PAUCIELLO shall be unable or unwilling to act or to continue to act as a Trustee of any Trust hereunder, MITCHELL RUBIN, by signifying his acceptance in writing, shall become a Trustee hereunder in her place. If neither ROSANNE PAUCIELLO nor MITCHELL RUBIN shall be able and willing to serve as Trustee of any Trust hereunder at any time, he or she shall be succeeded by such one or more individuals, or such series of one or more individuals, to serve as Trustees in consecutive order, as the last of them to serve shall designate in his or her Will or other written instrument delivered to the Settlor, if he is then living, or if he is not, to the adult beneficiary or beneficiaries of the Trust hereunder. If such Trustees fail so to designate a successor for a period of sixty (60) days following their inability or unwillingness to serve, or if all of their designees die, resign or are unable to serve, the vacancy may be filled by such individual or individuals as may be designated by the Settlor, if he is then living, or if he is not, by a majority of the beneficiaries under this Agreement who are sui juris; provided, however, that under no circumstances shall the Settlor, the Settlor's spouse if he should be married, either of the Settlor's former wives, the Settlor's Issue, or the spouses of any of the Settlor's Issue, be eligible to serve as successor Trustees hereunder. The Settlor specifically authorizes the selection of different Trustees for different trusts[13].

In 2009, Father was convicted of 137 counts of mail fraud, tax evasion and obstruction of justice and was sentenced to 55 months' imprisonment, a $411,000 fine, and $2,340,839 in restitution[14]. In August 2009, Father signed a durable power of attorney appointing Son and Myers as co-agents.

---

[13] R.R. 578-79 (Trust Agreement).
[14] *United States v. Fumo*, 655 F.3d 288, 294 (3d Cir. 2011).

In 2009, the FFLP made distributions to Father in the amount of $333,561[15]. There was no equalizing payment to Daughter's trust.

Over and above the distributions to Father, on January 22, 2010, Father, acting through Son and Myers, borrowed $1,400,000 from the FFLP. The terms of the loan required Father to pay interest at the rate of 5%, or $5,833.33 every month, beginning March 1, 2010, and, to pay all sums due on or before the maturity date of January 31, 2013[16]. The loan was secured by a mortgage on the premises at 2220 Green Street in Philadelphia[17]. Two days later, Father received the loan proceeds[18]. The record does not indicate that Daughter's trustee, Pauciello, participated in this transaction or consented to the loan.

In October 2010, the loan was amended to make the terms more favorable to Father. The amendment extended the original maturity date by two years to February 1, 2015[19]. Thereafter, the principal balance was to be amortized over twenty years at a fixed rate of 4.5%, thus extending the repayment date to 2035[20]. In return, Father agreed to a first mortgage on a home located on Kenyon Avenue in Margate City, New Jersey as additional

---

[15] R.R. 525 (testimony of Kirsten Flanagan, CPA), 804 (disbursement summary).
[16] R.R. 654 (equity line of credit agreement), 682 (amendment to equity line of credit loan).
[17] *Id*.
[18] R.R. 466, 525, 804 (disbursement summary).
[19] R.R. 662 (amendment to equity line of credit loan).
[20] *Id*.

security[21]. He also agreed, in the event of a change of ownership of either the Kenyon Avenue or Green Street properties, to pay not less than $250,000 to the FFLP towards reduction of the principal balance owed[22]. In the event title to both properties changed, the entire loan was to become immediately due and payable[23]. Upon Father's death, the entire unpaid balance of the principal and interest under the loan was to become immediately due and payable[24]. Once again, the record does not indicate that Pauciello participated in this transaction or consented to the loan.

In a letter dated October 24, 2010, Father wrote to Jane Scaccetti, Daughter's mother: "My goal is to become as judgment proof as possible. I want to own nothing but control everything. . . I never want to be this vulnerable to the Government or any creditors again in my life[25]!"

In an e-mail dated September 8, 2011, Pauciello notified Cosanzo, then president of the FFLP, that she was resigning as trustee[26]. After submitting her notice of resignation, Pauciello abandoned her duties as trustee[27]. Moreover, on October 14, 2011, Mitchell Rubin, whom the trust

---

[21] *Id*.
[22] *Id*.
[23] *Id*.
[24] *Id*.
[25] R.R. 1040 (letter from Father to Scaccetti).
[26] R.R. 461 (Son's testimony).
[27] Father argues that Pauciello subsequently agreed to continue serving as trustee. Father's Brief, p. 8 (citing R.R. 637) (exhibit AF-6; e-mail from Cosanzo to Son stating that Pauciello agreed to continue serving until "the tax returns were filed"). The Orphans' Court, however, did not make a

10

designated as successor trustee, renounced his appointment as trustee without naming a successor[28]. Paragraph 14 of the Trust Agreement authorized Pauciello and/or Rubin to appoint a successor trustee within 60 days of their unwillingness to serve as trustee[29], but neither of them appointed a trustee within the 60 day window. Moreover, paragraph 14 authorized Father to appoint a successor trustee if Pauciello and Rubin failed to appoint one[30], but Father did not make any appointment. As a result, the position of trustee effectively remained vacant from September 2011 until October 2012.

While the trusteeship remained vacant, Father changed the title to both the Kenyon Avenue and Green Street properties. On October 12, 2011, Father conveyed the Kenyon Avenue property from himself to himself and Carolyn Zinni, his fiancé, as joint owners[31]. Father did not make the required payment of $250,000 to the FFLP when he changed ownership of the Kenyon Street property. On February 21, 2012, Father conveyed the Green Street property from himself to himself and Son as joint owners[32]. Under the terms of the amended line of credit agreement, the loan became

---

factual finding that Pauciello agreed to continue serving as trustee. Therefore, neither can this Court. **Brown**, **supra**.

[28] R.R. 643 (October 14, 2011 e-mail from Rubin).

[29] R.R. 578-79 (Trust Agreement).

[30] **Id**.

[31] R.R. 470 (Son's testimony), 512-13 (Daughter's testimony), 983 (Bennett's deposition testimony); Orphans' Court Opinion, p. 6.

[32] R.R. 739 (reference in modification to equity line of credit).

immediately due and payable when he changed ownership of the Green Street property, and the failure to repay left the loan in default[33].

Beginning in August 2012, Son asked that the loan be repaid and requested an accounting of FFLP assets[34]. At that point, Father revoked Son's durable power of attorney.

On October 23, 2012, Pauciello appointed Bennett as successor trustee[35], even though she had announced her resignation as trustee more than one year before and failed to appoint a trustee within 60 days of her unwillingness to serve. Bennett has two close ties with Father: he is Zinni's brother-in-law[36], and Father, a former state senator, obtained a job for him at the Pennsylvania Turnpike Commission in 2008[37].

On October 26, 2012, Daughter filed a petition to terminate the trust, or, in the alternative, to nullify Bennett's appointment as trustee and appoint a successor trustee. Daughter subsequently filed two amended petitions in October and November of 2012[38].

---

[33] R.R. 662 (amendment to equity line of credit loan).
[34] R.R. 469-71 (Son's testimony), 695 (August 2, 2012 letter from Son to FFLP's president, Myers), 699 (August 13, 2012 letter from Son to Myers).
[35] R.R. 491 (testimony of Samuel Bennett), 493 (testimony of Bennett). On December 28, 2012, Bennett signed a document accepting his position as successor trustee.
[36] R.R. 463, 490.
[37] R.R. 491.
[38] R.R. 66 (second amended petition filed on November 21, 2012).

On November 10, 2012, Son, Daughter and Scaccetti met with Myers, who had succeeded Cosanzo as president of FFLP, and demanded that Myers declare the loan in default and demand repayment[39]. Myers refused[40].

On November 28, 2012, Daughter filed an emergency petition seeking the immediate appointment of an interim successor trustee. The Honorable Matthew Carrafiello signed a Rule To Show Cause scheduling a hearing for December 3, 2012[41]. The Rule stated: "All proceedings to stay in the meantime[42]."

One day later, on November 29, 2012, despite the Rule's directive to stay all proceedings, Myers signed a modification to the loan which voided the November 2010 amendment and cured or waived all defaults[43]. The modification required Father to pay interest only at the rate of 2.38%, or $2,776.66 every month, beginning December 1, 2012, until January 22, 2020, at which time the principal balance would be determined and amortized over twenty years at an annual rate not in excess of 4.5%[44]. This modification extended the date of repayment to 2040, when Father will be 97 years old and Daughter will be 50. Myers knew at the time he signed this modification that Son and Daughter "begged" that he take action to obtain

---

[39] R.R. 471-72 (Son's testimony), 512-13 (Daughter's testimony), 521-22 (Scaccetti's testimony).
[40] R.R. 471-72 (Son's testimony), 521-22 (Scaccetti's testimony).
[41] R.R. 771 (exhibit AF-26).
[42] *Id*.
[43] R.R. 739 (November 29, 2012 modification of equity line of credit loan).
[44] *Id*.

repayment of the loan instead of modifying it[45], and that Daughter had already filed a petition to appoint another trustee.

In April 2013, Son met with Father in federal prison. Son testified that Father stated:

> [I]t was our moral obligation to give [Father] everything in the Trust, all the assets, because he was broke. He needed the money and we should give it to him, he also said that there will never be an independent trustee for [Daughter's] trust. And he also said that he was going to win at all costs. The thing that sticks in my mind the most is he said, 'if it comes down to it, I'll hire a bunch of lawyers to just charge the FFLP until there's zero money left in it and you guys will have nothing[46].'

Based on Son's testimony, the court wrote: "I find that [Father] believes that his children have a moral obligation to give him all of the assets in the [FFLP]. I find that [Father] will never consent to the appointment of any successor trustee who will take actions contrary to his interests[47]."

On June 19, 2013, just two weeks before the evidentiary hearing on Daughter's second amended petition, Father signed a "contingent" document appointing Repici as successor trustee of Daughter's trust in the event any person challenged Bennett's authority to appoint a successor trustee or the

---

[45] R.R. 471-72 (Son's testimony), 512-13 (Daughter's testimony that "we begged Tommy Myers to please. . .call the note"), 521-22 (Scaccetti's testimony); **see also** exhibit AF-19 (Son's letter to Cosanzo dated November 29, 2012 demanding that loan be "called" immediately due to the change of ownership in the Green and Kenyon Street properties).
[46] R.R. 473-74 (Son's testimony).
[47] Orphans' Court Opinion, p. 10.

court determined that Bennett lacked authority to appoint a successor trustee[48]. Three days later, on June 22, 2013, Bennett resigned as trustee and appointed Repici as successor trustee[49]. On June 25, 2013, Repici accepted his appointment as successor trustee[50].

Repici has been Father's friend for over 50 years and was his personal physician for 25 years prior to Father's imprisonment[51]. Repici is also an attorney[52], but he never served as a trustee prior to this appointment[53].

Bennett admitted nominating Repici as successor trustee but claimed it was not his idea[54]. At first, Bennett insisted that he had no idea who suggested appointing Repici as trustee or when, and that he did not consult Daughter or her counsel before making the nomination[55]. Subsequently, Bennett admitted nominating Repici on advice of counsel but would not say how his attorney came up with Repici's name[56]. The court found Bennett untruthful and found as a fact that Father "orchestrated and directed

---

[48] R.R. 1095-96 (Settlor's Contingent Designation Of Successor Trustee For The Trust Established For the Benefit Of Allison Fumo Pursuant To the Vincent J. Fumo Irrevocable Children's Trust Agreement).
[49] R.R. 651 (Bennett's resignation).
[50] R.R. 1094 (Acceptance Of Nomination As Successor Trustee).
[51] R.R. 1051 (Repici's testimony), 1056 (Repici's testimony).
[52] R.R. 1047 (Repici's testimony).
[53] R.R. 1051 (Repici's testimony).
[54] R.R. 501-05 (Bennett's testimony).
[55] *Id*.
[56] *Id*.

[Bennett's] resignation. . .as successor trustee and [Repici's] appointment as successor trustee[57]."

Son testified that Repici's relationship with Father would interfere with taking actions that were in the best interests of Daughter's trust[58].

The Orphans' Court found Daughter's and Son's testimony "credible and convincing[59]." The court credited Daughter's testimony that Father is "a very manipulative man and will push and pull people to get his way[60]." Conversely, the court found Bennett untruthful, unreliable and lacking in knowledge about Daughter's trust[61]. The court found incredible Repici's claim that he would protect Daughter's trust against Father and would sue him if necessary[62]. Repici, the court concluded, would protect Father's interest to the detriment of the trust's[63].

The court also heard testimony from Daughter's nominee for trustee, Sylvia DiBona, a CPA and insurance broker as well as Daughter's godmother[64]. DiBona currently serves as a trustee of her own family's trust and on the Board of Directors of three non-profit organizations[65]. She understood the duties of a trustee, and she agreed to serve as successor

---

[57] Orphans' Court Opinion, p. 13.
[58] R.R. 474 (Son's testimony).
[59] *Id*., pp. 9-10, 13.
[60] Orphans' Court Opinion, p. 13 (citing N.T., 7/9/13, p. 245) (R.R. 515).
[61] *Id*., pp. 12-13.
[62] Orphan's Court Opinion, p. 17.
[63] *Id*.
[64] R.R. 528-29 (DiBona's testimony).
[65] *Id*.

trustee for Daughter's benefit without charging a fee[66]. Although she previously had ill will towards Father arising from his divorce from Scaccetti, she no longer held any grudge[67].

The court gave the following reasons for nullifying Repici's appointment as successor trustee and for appointing DiBona to this position:

> I do not believe Mr. Repici's statements that he will protect the interests of the beneficiary of the Trust against [Father], and, that he will sue [Father] if necessary. I believe that Mr. Repici was appointed by [Father] because [Father] expects Mr. Repici to protect the interests of [Father] against the Trust. I find that Mr. Repici will do so to the detriment of the Trust.
>
> Upon consideration of the record made by the parties in this matter, I voided the appointment of Anthony Repici to serve as successor trustee because it was made by [Father], and because it was inconsistent with material purposes of the trust.
>
> Because [Father] has borrowed $ 1,400,000.00 from the Fumo Family Limited Partnership, his interests are directly contrary to those of the Limited Partners who are his Son and the Trust for the benefit of his Daughter. The Modification dated November 29, 2012 is patently favorable to Vincent J. Fumo and detrimental to the Limited Partnership. On November 29, 2012, [Father] was sixty-nine years old with a history of heart attacks and a stated goal of being as judgment proof as possible; an incarcerated convict who claimed to be broke and in financial jeopardy; and, in default under the terms of the Loan Amendment of November of 2010. The Modification was signed on the day before a Hearing before Judge Carrafiello, and, in defiance of the vehement

---

[66] R.R. 529-30 (DiBona's testimony).

[67] *Id*.

objections of [Son], and [Daughter]. The Modification cures or waives all defaults; lowers the interest rate; deletes the additional security of the Margate property; deletes the requirement of payment in full on death; and, extends the mortgage to the year 2040 when, if he is alive, [Son] will be seventy-seven years old, and, Allison Fumo will be fifty years old.

I have found that Anthony Repici was appointed Successor Trustee by [Father], a debtor of the Trust, because [Father] expects Mr. Repici to protect the interests of [Father] against the Trust, and, that Mr. Repici will do so to the detriment of the Trust. Such an appointment would make [Father] the de facto Trustee of the Trust which would be inconsistent with the material purpose of the Trust that [Father] is not eligible to serve as Successor Trustee [and] would enable [Father] to defeat collection of the debt, which is in default, and, would be inconsistent with the material purpose of the Trust that the Trust should be irrevocable.

I appointed Sylvia DiBona to serve as Successor Trustee because she is qualified to do so, and, because she can be relied upon to protect the interests of the Trust against [Father][68].

IV.

**A.** The Orphans' Court properly decreed Bennett's appointment of Repici null under the express terms of the Trust Agreement. Moreover, given the express terms of the Trust Agreement and the doctrine of unclean hands, the Orphans' Court properly decreed Father's appointment of Repici a nullity. Since these decrees created a vacancy in the office of successor

---

[68] Orphans' Court Opinion, pp. 17-19.

18

trustee, the Orphans' Court properly appointed DiBona to fill the vacancy.

***See*** 20 Pa.C.S. § 7764.

In general, the Orphans' Court must enforce the express directives of

a trust. As we recently observed:

> 'A trust is a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person....' ***In re Trust of Hirt***, 832 A.2d 438, 447-48 (Pa.Super.2003) (citing Restatement (Second) of Trusts, § 2). *The settled law in Pennsylvania is that 'the pole star in every trust ... is the settlor's ... intent and that intent must prevail*.' ***Estate of Pew***, 440 Pa.Super. 195, 655 A.2d 521, 533 (1994) … (quoting ***In re Trust Estate of Pew***, 411 Pa. 96, 106, 191 A.2d 399, 405 (1963)). The settlor's intent may be divined by considering the trust document as a whole. ***Farmers Trust Co. v. Bashore***, 498 Pa. 146, 150, 445 A.2d 492, 494 (1982) ('A settlor's intent is to be determined from all the language within the four corners of the trust instrument, the scheme of distribution and the circumstances surrounding the execution of the instrument. Only if a settlor's intent cannot be ascertained with reasonable certainty will a court apply canons of construction, to attribute a reasonable intention to the settlor in the circumstances.'); ***In re Walton's Estate***, 409 Pa. 225, 231, 186 A.2d 32, 36 (1962) (stating that the testator's intentions 'must be ascertained from the language and scheme of his [entire] will [together with the surrounding facts and circumstances]' (alteration in the original)).
>
> *The trust's specific provisions govern the trust's operation*. 20 Pa.C.S. § 7705(a)[69] ('Except as provided

---

[69] Section 7705 is part the Uniform Trust Code ("UTC"), which Pennsylvania codified in 2006. The common law of trusts and principles of equity supplement the UTC's statutory provisions. 20 Pa.C.S. § 7706. Therefore,

19

> in subsection (b) [listing certain mandatory rules], the provisions of a trust instrument prevail over any contrary provisions of [Pennsylvania law].'); ***In re Estate of Niessen***, 489 Pa. 135, 139, 413 A.2d 1050, 1052 (1980) ('The nature and extent of the duties of a corporate trustee are primarily to be ascertained from the trust instrument.').

***In Re Estate of Warden***, 2 A.3d 565, 572 (Pa.Super.2010) (emphasis added).

The Orphans' Court, however, is a court of equity. ***In Re I.L.P.***, 965 A.2d 251, 256 (Pa.Super.2009) (citing ***In re Gibson's Estate***, 34 A.2d 159, 161 (1943). In its exercise of equitable powers, the Orphans' Court may decline to enforce express provisions of a trust when the party seeking enforcement has unclean hands. The unclean hands doctrine derives "from the unwillingness of a court to give relief to a suitor who has so conducted himself as to shock the moral sensibilities of the judge, and it has nothing to do with the rights or liabilities of the parties." ***Bosley***, ***supra***, 26 A.3d at 1114 (citing ***Estate of Pedrick***, 482 A.2d 215, 222 (Pa.1984)). This doctrine applies "where the wrongdoing directly affects the relationship subsisting between the parties and is directly connected with the matter in controversy." ***Id***. (citing ***Pedrick***, 482 A.2d at 223)[70].

---

we rely on Pennsylvania common law to the extent it is consistent with the UTC. ***Id***.

[70] Defendants who act unconscionably in equity matters are subject to the unclean hands doctrine as well as plaintiffs. ***See***, ***e.g.***, ***Jacobs v. Halloran***, 710 A.2d 1098, 1103-04 (Pa.1998) (defendant in motor vehicle accident case was not entitled to equitable remedy of judgment of non pros for

In this case, Paragraph 14 of the Trust Agreement provides the following procedure for selecting a successor trustee:

(1)    Pauciello and Rubin have the authority to designate a successor if they become unwilling to act or to continue to act as trustee;

(2)    The settlor (Father) may fill the vacancy if Pauciello and Rubin fail to designate a successor within 60 days after becoming unwilling to serve;

(3)    The settlor cannot appoint himself as successor trustee; and

(4)    If the settlor is not living, "a majority of the beneficiaries under [the] agreement who are *sui juris*" may fill the vacancy[71].

Under paragraph 14's express terms, the Orphans' Court properly declared Bennett's appointment of Repici a nullity.    Pauciello became unwilling to continue to serve as trustee on September 8, 2011, the date she submitted her notice of resignation, so she had 60 days from this date to appoint a successor trustee.    Her appointment of Bennett on October 23, 2012, almost one year after the 60 day window expired, was a nullity.    And

---

plaintiff's delay in prosecuting action, where defendant waited more than two years after filing of complaint before admitting that she was passenger in vehicle instead of driver; defendant "came before the court with unclean hands. . .[her] dishonesty regarding the identity of the driver of the vehicle constitutes bad faith which is directly relevant to the delay in prosecution from which she seeks relief. To allow her to benefit from a delay which she in part created is inequitable and will not be permitted").
[71] R.R. 578.

since Bennett's appointment was null, Bennett's attempt to appoint Repici as successor trustee was null as well.

In addition, the Orphans' Court properly declared Father's appointment of Repici a nullity. Since paragraph 14 expressly proscribes Father from appointing himself as successor trustee, this provision implicitly prohibits the appointment of Father's alter egos to this position. The Orphans' Court clearly (and correctly) regarded Repici as Father's alter ego:

> I do not believe Mr. Repici's statements that he will protect the interests of the beneficiary of the Trust against [Father], and, that he will sue [Father] if necessary. I believe that Mr. Repici was appointed by [Father] because [Father] expects Mr. Repici to protect the interests of [Father] against the Trust. I find that Mr. Repici will do so to the detriment of the Trust[72].

Thus, to enforce the intent of the Trust Agreement, the Orphans' Court properly nullified Father's appointment of Repici. **Warden**, **supra**, 2 A.3d at 572 ("the pole star in every trust is the settlor's intent and that intent must prevail"). Appointment of an alter ego such as Repici would frustrate the purpose of the Trust Agreement by exalting Father's interests over Daughter's.

The doctrine of unclean hands provides additional justification for the Orphans' Court's decree. The court credited evidence that Father (1) is a "very manipulative man" who will stop at nothing to "get his way"; (2) is a

---

[72] Orphans' Court Opinion, p. 17.

federal convict with a stated goal of being as judgment proof as possible; (3) regards his children as having a moral obligation to give him all of the assets in the trust; (4) borrowed $1,400,000 from the FFLP but then failed to repay the loan; (5) modified the loan to extend the repayment date from 2013 to 2040, when he will be 97 years old and Daughter will be 50; and (6) defaulted on the loan by changing the ownership of the properties that secured the loan. Moreover, the court concluded that Father appointed Repici for the purpose of protecting Father's interests "against the Trust," and that Repici would "protect the interests of [Father] against the Trust." The court conveyed its deep sense of repugnance over Father's conduct, particularly Father's determination to appoint a successor trustee who would exalt Father's interests over his fiduciary duties as trustee. Without invoking the phrase "unclean hands", the court found, in so many words, that Father acted with unclean hands through a course of "wrongdoing [which] directly affects the relationship subsisting between the parties and is directly connected with the matter in controversy." **Bosley**, **supra**, 26 A.3d at 1114. We find no abuse of discretion in this determination or in the decision to nullify Father's appointment of Repici.

Having decreed Repici's appointment a nullity, the Orphans' Court properly filled the vacancy by appointing DiBona as successor trustee. The UTC provides the following procedure for filling vacancies in trusteeships:

23

> A vacancy in a trusteeship of a noncharitable trust that is required to be filled *shall be filled in the following order of priority:*
>
> *(1) by a person designated in or pursuant to the provisions of the trust instrument to act as successor trustee;*
>
> *(2) by a person appointed by unanimous written agreement of the qualified beneficiaries; or*
>
> (3) by a person appointed by the court.

20 Pa.C.S. § 7764(c) (emphasis added). Under section 7764(c)(1), the vacancy must be filled in accordance with paragraph 14 of the Trust Agreement. As explained above, Pauciello and Rubin failed to appoint a successor in compliance with paragraph 14, and Father is incapable of choosing a responsible successor due to unclean hands. Thus, the Trust Agreement authorizes "a majority of the beneficiaries under [the] agreement who are *sui juris*[73]" to fill the vacancy. Daughter, the only remaining beneficiary under the Trust Agreement, selected DiBona as successor trustee.

The Orphans' Court acted within its discretion by appointing DiBona as successor. **Taylor's Estate**, **supra**. DiBona is a CPA and insurance broker with considerable experience in trust administration and the stewardship of non-profit organizations. She will administer the trust without charge, and

---

[73] R.R. 578.

she has no ties to Father which would create any conflict of interest in the administration of Daughter's trust.

**B.** As an independent ground for affirming the decree, we hold that the Orphans' Court acted within its discretion by ordering Repici's removal and substituting DiBona as trustee under 20 Pa.C.S. § 7766(b)(4) due to a "substantial change in circumstances" in the management of Daughter's trust.

Section 7766 provides in relevant part:

> **(a)** The settlor, a cotrustee or a beneficiary may request the court to remove a trustee or a trustee may be removed by the court on its own initiative.
>
> **(b) When court may remove trustee.--**The court may remove a trustee if it finds that removal of the trustee best serves the interests of the beneficiaries of the trust and is not inconsistent with a material purpose of the trust, a suitable cotrustee or successor trustee is available and:
>
> (1) the trustee has committed a serious breach of trust;
>
> (2) lack of cooperation among cotrustees substantially impairs the administration of the trust;
>
> (3) the trustee has not effectively administered the trust because of the trustee's unfitness, unwillingness or persistent failures; or
>
> (4) *there has been a substantial change of circumstances*. A corporate reorganization of an institutional trustee, including a plan of merger or consolidation, is not itself a substantial change of circumstances.

25

*Id*. (emphasis added).

Recently, in *In re McKinney*, 67 A.3d 824 (Pa.Super.2013), this Court held that a trust beneficiary has standing to seek removal of a trustee under section 7766(b)(4) due to a material change in circumstances. The beneficiary must show by clear and convincing evidence that: (1) the removal serves the beneficiary's best interests; (2) the removal is not inconsistent with a material purpose of the trust; (3) a suitable successor trustee is available; and (4) a substantial change in circumstances has occurred. *Id*., 67 A.3d at 830. Section 7766(b)(4) is a "no fault" provision. While the trust beneficiary has the option to submit evidence that the current trustee has administered the trust in a way that "undermined" or "harmed" the beneficiaries' interests, such proof is not mandatory. *Id*.

The best interests analysis implicitly requires a comparison of whether the current trustee or the proposed successor trustee best serves the beneficiary's interests. *McKinney*, 67 A.3d at 832-33 (citations omitted). In making this comparison, the Orphans' Court should consider the personalization of service; cost of administration; convenience to the beneficiary; efficiency of service; personal knowledge of trusts and the beneficiary's financial situation; the location of the trustee as it affects trust income tax; experience; qualifications; personal relationship with beneficiaries; settlor's intent as expressed in the trust document; and any other material circumstances. *Id*. at 833 (citations omitted). No one factor

26

in this nonexhaustive list outweighs the others. Instead, the court must consider these factors, if the parties present evidence thereof, on a case-by-case basis. *Id.* at 833-34.

Applying these standards, we held in **McKinney** that the Orphans' Court abused its discretion by determining that the no-fault removal of a Pennsylvania trustee (PNC Bank) under section 7766(b)(4) and its replacement by a successor trustee was not in the best interests of the beneficiaries of a testamentary trust and a descendants' trust. We explained that substantial changes in circumstances warranted PNC's removal, namely the family's relocation to Virginia and multiple corporate mergers of the original Pennsylvania trust institution, which resulted in the loss of trusted bank personnel and administration of the trust by different bank officers. The proposed successor trustee, another financial institution (SunTrust Delaware), offered the beneficiaries personalized service, greater convenience due to its location in Virginia, more efficient service due to its administration of several family trusts, and greater personal knowledge of the overall financial service needs of the beneficiaries. *Id*. at 834, 836. PNC's removal was not inconsistent with a material purpose of the trust, since the settlor did not specify in the trust that it was material for a Pennsylvania trustee to administer the trust, and since the proposed successor trustee was amply qualified to administer the trust. *Id*. at 836.

While we reversed the lower court's order denying PNC's removal as trustee, we stopped short of holding that SunTrust Delaware must be the successor trustee despite praising its abilities. Instead, we remanded for a "definitive finding as to the suitability of SunTrust Delaware as a successor trustee," *Id*. at 837 – a prudent decision, since the Orphans' Court should select the successor trustee in the first instance instead of an appellate panel.

*McKinney* also observed that "where a settlor personally chooses an individual to act as trustee, the selection represents an expression of trust and confidence, and removal of a personally chosen individual is thus considered to be a drastic remedy." *Id.* at 835. This point was not central to *McKinney's* holding, since the settlor in that case chose a financial institution to act as trustee instead of an individual. In the present case, however, this issue is relevant due to Father's selection of individuals such as Pauciello and Rubin to serve as trustees in the Trust Agreement.

The Orphans' Court did not expressly mention *McKinney* in its August 1, 2013 decree or October 28, 2013 opinion. But because *McKinney* sets forth the controlling principles with regard to removal of trustees under section 7766(b)(4), we will apply *McKinney's* four-part test to determine whether the Orphans' Court's decision to remove Repici and substitute DiBona as successor trustee was proper.

28

*McKinney* first directs us to analyze whether there is clear and convincing evidence that Repici's removal is in Daughter's best interests. *Id*., 67 A.3d at 830.  In making this determination, we defer to the Orphans' Court's factual findings that are supported by the evidence and to its credibility determinations absent an abuse of discretion.  *Brown*, *supra*, 30 A.3d at 1206.  Here, the record furnishes more than adequate support for the Orphans' Court's factual findings and credibility determinations.  Ample evidence buttresses the court's finding that Father engineered Repici's appointment as trustee in order to serve Father's ends instead of to protect Daughter's interests.  Not only is Repici a doctor with no apparent expertise in financial matters or in handling trusts, but he is Father's close, longtime friend.  Father arranged for Repici's installment so that Father could both control and use trust assets for his *own* benefit and guarantee that Daughter's trust will not object to Father's attempt to modify the terms of repayment of the January 22, 2010 loan.  Thus, there is clear and convincing evidence that Repici's appointment is antithetical to Daughter's interests and requires his removal as trustee.

*McKinney's* second criterion requires us to examine whether removal of the trustee is consistent with a material purpose of the trust.  *McKinney*, 67 A.3d at 830.  The record demonstrates that Father created Daughter's trust to benefit her financial interests and ease her burden in raising her own children.  For the reasons given in the preceding paragraph, there is clear

29

and convincing evidence that Repici's removal is consistent with the purpose of Daughter's trust.

*McKinney* next instructs that we assess whether DiBona is a suitable successor trustee. As we explained above, there is clear and convincing evidence that DiBona is a suitable successor trustee.

Finally, *McKinney* directs us to examine whether there has been a material change in circumstances that requires Repici's dismissal and DiBona's appointment as trustee. The Orphans' Court found, and the record demonstrates, that Father created Daughter's trust in 2006, when he was affluent and wanted to provide for Daughter's financial comfort. Several years later, however, Father went to federal prison, leaving him in substantially worse financial condition. This downturn has substantially changed his attitude towards the trust assets. Instead of desiring to provide for Daughter's well-being, he now asserts that he is morally entitled to all money in the trust and has attempted to exercise control over the trust by inserting persons with allegiance to him, such as Repici, as trustees. In his own words, he wants to "own nothing yet control everything." His actions are consistent with this manipulative goal. In the same year that he went to prison, he received distributions from the FFLP in the amount of $333,561 without making an equalizing payment to Daughter's trust. In 2010, he borrowed $1.4 million from the FFLP, but he has amended the loan twice in order to lower its interest rate and extend its repayment date 27 years from

2013 to 2040, a date well past his life expectancy. Furthermore, he placed the loan in default by changing the ownership of the Kenyon Street and Green Street properties without paying the balance of the loan, and he has refused to cure the default.

These events provide clear and convincing evidence of a substantial change in circumstances that compels Repici's removal and DiBona's substitution as successor trustee. The trust has been without effective, independent leadership for years and is manifestly in need of a trustee who is able and willing to protect Daughter's interests. The Orphans' Court concluded, and the record confirms, that Repici is not suitable for this purpose; he will simply stand by and allow Father to take whatever action he wants. Conversely, the Orphans' Court determined, and the record confirms, that DiBona will take all necessary measures to protect Daughter's interests.

We hold that the Orphans' Court's decree removing Repici as trustee and installing DiBona as successor trustee satisfies all of **McKinney's** criteria and therefore is proper under section 7766(b)(4).

V.

Finally, we address several procedural arguments. Father argues that Daughter has no right to seek Repici's removal because her petitions only sought Bennett's removal as trustee. We disagree. Daughter's petition and amended petitions sought Bennett's removal because Bennett was trustee in

31

October and November 2012, when Daughter filed her original and amended petitions seeking a successor trustee. Repici was not appointed until 8 months later, in June 2013, just two weeks before the first day of evidentiary hearings. Since Repici was not appointed as trustee until the eleventh hour, we do not find fault with Daughter's failure to amend her second amended petition to contest Repici's appointment.

In any event, Father has waived his objection to Daughter's failure to amend, since we see no objection to Daughter's failure to amend either in the trial transcript or in Father's post-hearing brief[74]. Pa.R.A.P. 302(a) ("issues not raised in the lower court are waived and cannot be raised for the first time on appeal"). Furthermore, Father suffered no prejudice from Daughter's failure to amend, since he was able to mount a vigorous defense during the evidentiary hearings in support of Repici's appointment.

In his next argument, Father contends that the Orphans' Court abused its discretion by not continuing the case or keeping the record open for him to testify himself. Father was in prison at the time of the hearings but was released shortly thereafter in August 2013.

The court acted within its discretion in refusing to keep the record open. Father could easily have testified via deposition from prison, **see** Pa.R.Civ.P. 4020(b) (permitting use at trial of depositions for unavailable

---

[74] Nor do Father's appellate briefs identify where he raised this objection during Orphans' Court proceedings. **See** Father's Opening Brief, p. 20 (statement of place raising or preserving issues).

witnesses), but failed to exercise this right. Alternatively, Father could have requested that the Orphans' Court order his production in court and then submitted this order to the United States Marshal for review. *See* United States Marshals Service Policy Directive 9.13(B)(3) ("If provided with a properly executed court order, the [United States Marshal] may honor requests for producing federal prisoners in state civil cases"). Father did not exercise this option.

Father has only himself to blame for his failure to present in-court or deposition testimony. Moreover, his claim of prejudice is speculative, because he fails to explain how his in-court testimony would have changed the outcome of this case.

Lastly, Father argues that the court erred by not sustaining his preliminary objections to the second amended petition for failure to state sufficient grounds to remove the trustee. Father suffered no prejudice from the court's decision to overrule his preliminary objections, because the case proceeded to two days of hearings and post-hearing briefing, where Father had a full and fair opportunity to raise the same objections that he raised in his preliminary objections.

Decree affirmed.

Judge Lazarus joins in the Opinion.

Judge Panella files a Dissenting Opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>10/17/2014</u>