J-A09038-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| ESTATE OF: MARY G. H. DAVIS, DECEASED | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| APPEAL OF: SUSAN P. TREADWAY, BETSEY W. DAVIS, MARY G. COOKE AND JAMES C. TREADWAY | No. 2551 EDA 2014 |

Appeal from the Decree dated July 18, 2014
In the Court of Common Pleas of Montgomery County
Orphans' Court at No: 1990-X1644

BEFORE: BOWES, DONOHUE, and STABILE, JJ.

MEMORANDUM BY STABILE, J.: **FILED SEPTEMBER 11, 2015**

This appeal involves a dispute over the estate of Mary G. H. Davis ("Decedent"). In this regard, her daughters Betsey W. Davis, Mary G. Cooke and Susan P. Treadway, and her son-in-law and Susan's husband James C. Treadway (individually "Betsey," "Mary," "Susan," and "James," and collectively "Appellants") appeal from the July 18, 2014 decree entered by the Court of Common Pleas of Montgomery County, Orphans' Court Division ("orphans' court"). The orphans' court, *inter alia*, granted Decedent's son's, E. Morris Davis, IV ("Appellee" or "Morris"), summary judgment motion titled "Motion for Return of Property No Longer in Dispute," and dismissed Appellants' objections to accounting. Upon review, we affirm.

The orphans' court summarized the facts and procedural history of this case as follows.

[Decedent] died on May 26, 1990, leaving a will dated September 14, 1989, in which she appointed her son, [Morris], and her son-in-law, [James], as co-executors. Letters testamentary were granted by the Montgomery County Register of Wills on June 1, 1990. The [e]xecutors filed an [i]nventory dated June 19, 1990 and filed a Pennsylvania [i]nheritance tax return, as well as a copy of the [f]ederal [e]state [t]ax return in 1991. The [i]nventory incorporated an appraisal of tangible personal property that was located in Decedent's residence at her death. The Pennsylvania [i]nheritance tax return and [f]ederal [e]state tax return also included an appraisal of [D]ecedent's tangible personal property. Apart from a significant parcel of real estate, the majority of the estate assets were distributed during the first few years of the administration of the estate.

Following the 1990 and 1991 tax filings, no activity occurred in the Register of Wills' office or in the Clerk of the Orphans' Court division until October 12, 2000, at which time an agreement entitled "Receipt, Release, Waiver and Agreement of Indemnity" was filed, which had been signed by Mary[.] This document in paragraph 4 represents that "**the only asset remaining in the estate is the Lafayette Road property**." This refers to the real property that was the home of [Decedent]. Apparently, complications arose regarding the subdivision of the real property and the distribution of the property in shares to the three daughters of [D]ecedent, resulting in lengthy delay of final distribution under the [w]ill. [Mary] acknowledged in this [r]eceipt and [r]elease [d]ocument that "the co-executors have made distribution to her of all of the balance of the proceeds of the estate" and have "delivered to her the amount distributable to her". *See* Receipt, Release, Waiver and Indemnity Agreement dated October 12, 2000.

Although there were no proceedings in the [o]rphans' [c]ourt during the first ten years following the death of [Decedent], there was a dispute litigated in the Civil Division of the Court of Common Pleas of Montgomery County among the [e]state and Decedent's daughters, as plaintiffs, and [Morris] and his wife as defendants. This matter was resolved by stipulation in open court on February 19, 1991, followed by a written stipulation signed by the parties' attorneys.

Civil litigation was again commenced in 2010 among [Morris] and his sister, Susan [], and his brother-in-law, James [], concerning certain disputed articles of personal property and certain real estate. The estate of [Decedent] is not party to this civil dispute.

The dispute in the Civil Division of the Montgomery County Court of Common Pleas arose in 2010 and concerns a home in which [Morris] and his wife, Bridgitta had been living. Susan and James [] changed the locks on the home and took possession of certain items of tangible personal property that was then within the home. The parties commenced two civil disputes in which they advanced claims and counterclaims regarding possession and use of the real estate, a claim for rent for the real estate, and a vigorous dispute over the ownership of the items of tangible personal property (hereinafter, collectively, the "Disputed Items"). Upon consideration of preliminary objections in this civil action, the claims regarding the tangible personal property were transferred to the Orphans' Court division for disposition.[FN1] **See** Order dated July 7, 2011, Docket #2010-15013.

> [FN1:] While the Petition to compel the filing of an Account was pending but before the Account had been filed, the Honorable William Carpenter issued an order dated July 7, 2011 in the civil matter listed at docket no. 2010-15013, captioned **E. Morris Davis, IV v. Susan P. Treadway**. This order granted preliminary objections to certain counts in that civil matter, (Count I (Conversion), Count II (Fraud), Count V (Accounting), Count VI (Injunctive Relief) and Count VII (Replevin) of the Amended Complaint of E. Morris Davis), and transferred jurisdiction over the disputes regarding ownership of certain items of tangible personal property to the Orphans' Court division to be raised in conjunction with the proceedings in the Estate of Mary G. H. David, docket no. 1990-X1644.

There are several categories of Disputed Items of tangible personal property. The parties do not dispute that the Disputed Items originally belonged to [Decedent] and her husband during their lives. Nor is there any dispute most of that [sic] the Disputed Items were in the possession of [Morris] as of March of 2010. However, there are certain items that [Morris] claims that he never possessed and certain other items that [Morris] received but sold. [Morris] claims that the remaining Disputed Items belong to him and were received by him as gifts from his mother during her lifetime. With respect to most of the Disputed Items, [Morris] claims that he received them as gifts from his mother decades before her death. [Appellants] claim that the Disputed Items belonged to [Decedent] and were property of her estate at the time of her death, although they acknowledge that many of the Disputed Items were in the possession of [Morris] at the time of their mother's death.

More than two decades after the death of Decedent, following the commencement of the civil litigation, Susan [], Betsey [], Mary [] and James [] . . . filed on March 8, 2011, a [p]etition for citation to show cause why an [a]ccount should not

be filed, seeking to compel [Morris], one of the two co-executors to account for the Disputed Items of tangible property that they allege he held in his capacity as [e]xecutor of the [e]state of [Decedent]. No [a]ccount had previously been filed by the [e]xecutors. [Appellants] assert that in 2010 they discovered that [Morris] had in his possession certain items of tangible personal property that "they recognized as having been in [D]ecedent's possession at or shortly before the time of her death." *See* Petition for Citation dated March 8, 2011. [Morris] asserts in his [a]nswer that the Disputed Items of personal property at issue "were not owned at the time of [D]ecedent's death." To the contrary, [Morris] asserts that most of the items of personal property had been given to him by his mother decades before her death.

Thus, this [instant] controversy was initially brought to the attention of the [o]rphans' [c]ourt division by the filing on March 8, 2011, of a [p]etition to [c]ompel the filing of an [a]ccount. Th[e orphans' court] ordered [Morris] to file an [a]ccount of his administration of the [e]state of [Decedent.] After several extensions of time, [Morris] filed an [a]ccount on November 30, 2011. [Morris] filed a [l]imited [a]ccount, limited to jewelry and tangible personal property with an aggregate value of $23,637.50, which he acknowledges were assets of the estate. The items listed on this [l]imited [a]ccount were previously disclosed on the [i]nventory and [t]ax returns filed by the [e]state. [Morris] denie[d] knowledge of the disposition of these items and assert[ed] that the disposition of these items [was] known only to his co-executor, James[.] On February 3, 2012, [o]bjections were filed by [Appellants] . . . to this [a]ccount. [Appellants] listed approximately 37 additional items of tangible personal property which were not listed in the [l]imited [a]ccount filed by [Morris], but which [Appellants] assert[ed] actually belonged to Decedent at the time of her death and should have been accounted for as part of the [e]state.

[Morris] has filed in the [o]rphans' [c]ourt [d]ivision a [summary judgment] [m]otion entitled "Motion for Return of Property No Longer in Dispute and/or For Which There is Not a Substantial Dispute and Overrule All Remaining Objections to the Account of E. Morris Davis, IV[.]"[1] A Rule was issued, returnable February 5, 2013. No party appeared to show cause why the [m]otion should not be granted, and no response to the [m]otion was filed by the opposing parties. [Appellants] filed voluminous exhibits, a memorandum and two sworn declarations on February 11, 2013, immediately before oral argument.

---

[1] Appellants point out Morris's summary judgment motion was unverified. We, however, need not address this issue because Appellants did not raise it before the orphans' court. *See* Pa.R.A.P. 302(a).

The issue in dispute before th[e orphans' court] with respect to this [a]ccount and the [o]bjections, and the [m]otion filed by [Morris], is whether the 39 items of tangible personal property (plus an automobile) identified by [Appellants] are property of Decedent's estate subject to distribution under her [w]ill. [Morris] also seeks to raise a claim to 7 additional items of tangible personal property not identified in the [o]bjections. Of these 47 items in dispute, [Morris] addresses in his motion only 32, although he also takes the position with respect to 11 items that he does not know their location and that [Appellants] should be estopped from asserting a claim with respect to these items as well. There are several distinct categories of tangible personal property, which the [c]ourt has been at pains to categorize, and which are itemized on a [t]able attached hereto as Schedule A, with respect to which the parties make slightly different claims. The categories of items of tangible personal property can be described as follows:

I. Four Items claimed by [Appellants] to be property of the [e]state, in the possession of [Morris] at date of Decedent's death until the present.

II. Fifteen Items claimed by [Appellants] to be property of the [e]state, that were in the possession of [Morris], at Decedent's date of death until 2010, but are now in the possession of Susan and James Treadway.

III. Three Items that were in [Morris's] possession until 2010 are now in possession of Susan and James Treadway, but as to which [Appellants] assert they were in Decedent's residence at her date of death.

IV. Four Items claimed by [Appellants] to be property of the [e]state, that were in the possession of [Morris] following Decedent's death but were sold following Decedent's death and before 2010.

V. Eleven Items claimed by [Appellants] to be property of the [e]state, as to which [Morris] claims he does not know the whereabouts of these items and does not possess them.

VI. Seven Items claimed by [Morris] to be his property that are now in the possession of Susan and James Treadway, but which are not specifically identified by [Appellants] on the [o]bjections to the [a]ccount as assets of the [e]state (although the [o]bjections include a "catch-all" objection number 4, regarding other items not specifically identified by [Appellants] but that may belong to the [e]state).

VII. Decedent's [a]utomobile and two other items to which [Morris] does not refer in his motion, but which were listed in the [o]bjections to the [a]ccount.

Orphans' Court Opinion, 7/18/14, at 1-6 (emphasis added). On July 18, 2014, the orphans' court granted Morris's summary judgment motion and, as a result, dismissed Appellants' objections to the account. In granting the summary judgment motion, the orphans' court principally applied the doctrine of laches to conclude Appellants were barred from instituting the instant action. Appellants timely appealed to this Court.[2]

In arguing the orphans' court erred in granting Morris's motion for summary judgment, Appellants raise two issues on appeal.[3] First, Appellants argue the orphans' court erred in applying the affirmative defense

_____

[2] The orphans' court did not order Appellants to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. The court, however, issued a Pa.R.A.P. 1925(a) opinion, incorporating the reasons set forth in its July 18, 2014 opinion granting Morris's summary judgment motion.

[3] Although Appellants present us with the following five issues, we have consolidated them into two for ease of disposition.

> 1. Whether the lower court erred in considering laches as a defense to Appellants' objections to [Morris's] account as co-executor of the Estate of Mary G. H. Davis, given [Morris's] failure to plead it in his answers to Appellants' petition for an account and to their objections to his account.
>
> 2. Whether the lower court properly formulated and applied the "undue delay" element of laches.
>
> 3. Whether the lower court erred in holding that the summary judgment record demonstrated "undue delay" beyond genuine dispute.
>
> 4. Whether the lower court properly formulated and applied the "prejudice" element of laches.
>
> 5. Whether the lower court erred in holding that the summary judgment record demonstrated "prejudice" beyond genuine dispute.

Appellants' Brief at 4.

- 6 -

of laches *sua sponte*.  Appellants argue Morris failed to raise laches in his response to, *inter alia*, the petition for accounting.  Second, and alternatively, Appellants argue the orphans' court erred in determining there were no genuine issues of material fact with respect to the "undue delay" and "prejudice" elements of laches.

When reviewing an order granting summary judgment, we must determine whether the orphans' court abused its discretion or committed an error of law.[4]  **See In re Estate of Hooper**, 80 A.3d 815, 818 (Pa. Super. 2013); **accord Hovis v. Sunoco, Inc.**, 64 A.3d 1078, 1081 (Pa. Super. 2013) (citation omitted); **Mee v. Safeco Ins. Co. of Am.**, 908 A.2d 344, 347 (Pa. Super. 2006).  Our scope of review is plenary.  **See Sevast v. Kakouras**, 915 A.2d 1147, 1152 (Pa. 2007) (citation omitted); **accord Pappas v. Asbel**, 768 A.2d 1089, 1095 (Pa. 2001).  In reviewing an orphans' court's grant of summary judgment, we apply the same standard employed by the orphans' court, *i.e.*, we review all of the evidence in the light most favorable to the non-moving party  and resolve all doubts as to the existence of a genuine issue of material fact against the moving party. **See Erie Ins. Exch. v. Weryha**, 931 A.2d 739, 741 (Pa. Super. 2007).

---

[4] To the extent Morris argues the orphans' court did not rule on his summary judgment motion, such argument is belied by the record.  As noted earlier, the orphans' court expressly granted Morris's summary judgment motion, and in so doing, dismissed Appellants' objections.

"Only when the facts are so clear that reasonable minds could not differ can a trial court properly enter summary judgment." *Hovis*, 64 A.3d at 1081.

With this standard in mind, we first address Appellants' argument that the orphans' court erred in applying the doctrine of laches *sua sponte*.

The doctrine of laches is an equitable bar to the prosecution of stale claims and is the practical application of the maxim: those who sleep on their rights must awaken to the consequences that they have disappeared. *Fulton v. Fulton*, 106 A.3d 127, 131 (Pa. Super. 2014) (citation and quotation marks omitted). Because the application of laches involves a question of law, we are not bound by the orphans' court's ruling on the issue. *Id.* As we recently explained, the doctrine of laches:

> is an equitable doctrine which bars relief when the complaining party is guilty of want of due diligence in failing to promptly institute the action to the prejudice of another. In order to prevail on an assertion of laches, respondents must establish: a) a delay arising from petitioner's failure to exercise due diligence; and, b) prejudice to the respondents resulting from the delay. The question of laches is factual and is determined by examining the circumstances of each case. . . . [L]aches is an equitable doctrine that should not be applied in favor of a person who has failed to take required action on his own.

*Vill. of Four Seasons Ass'n, Inc. v. Elk Mountain Ski Resort, Inc.*, 103 A.3d 814, 823 (Pa. Super. 2014) (citation omitted). The party asserting laches as a defense must present evidence demonstrating prejudice from the lapse of time. Such evidence may include establishing that a witness had died or become unavailable, that substantiating records were lost or destroyed, or that the defendant has changed his position in anticipation

that the opposing party has waived his claims. *Fulton*, 106 A.3d at 131 (quotation marks and citation omitted).

Here, our review of the record reveals the orphans' court did not raise laches *sua sponte*. On the contrary, Morris raised it in his pleadings. In particular, Morris asserted in his *pro se* response to the petition for accounting that Susan "had entered the property numerous times previously, and had never made a mention, reference, comment or made any other sign of a contest of ownership of the chattels, despite [Morris's] continued and exclusive ownership and customary acts of ownership during such visits." Morris's Answer to Petition for Accounting, 4/12/11, at ¶ 9. Moreover, in his response to Appellants' objections, Morris argued:

> Each of the [Appellants] had personally been in his house and seen [Morris's] in full and outright possession and ownership of the majority of the above mentioned items over the last 25+ years. Upon his father's passing, [D]ecedent gifted [Morris] many items. At no point was possession or ownership ever contested or questioned.

Morris's Response to Objections, 2/27/12, at ¶ 4. Although we recognize Morris did not use the term "laches," he certainly alleged facts to establish laches as a defense to Appellants' objections. T here is no need to name an affirmative defense "if facts sufficient to constitute the defense are pled." *Iorfida v. Mary Robert Realty Co.*, 539 A.2d 383, 397 (Pa. Super. 1988) (finding that a single paragraph of defendant's new matter sufficiently raised abandonment as an affirmative defense). Thus, based on the foregoing, we, like the orphans' court, construe Morris's pleadings to include laches. As a result, we cannot conclude the orphans' court raised laches *sua sponte*.

Having determined laches was properly raised, we now turn to Appellants' alternative argument that the orphans' court erred in concluding Morris satisfied the undue delay and prejudice elements of laches.

As noted earlier, to prevail on an assertion of laches, Morris must establish a delay arising from Appellants' failure to exercise due diligence and prejudice to Morris resulting from the delay. **See Elk Mountain**, **supra**.

With respect to undue delay, Appellants argue the orphans' court erred in concluding they were aware of Morris's possession of the disputed items because evidence of awareness was controverted in the record. In other words, Appellants argue the existence of genuine issues of material fact relating to their awareness of the disputed items. Appellants, however, fail to support their argument with record evidence. They do not cite to the record to establish they were unaware of Morris's possession of the disputed items.[5]

In the argument section of their brief, Appellants do not even appear to challenge knowledge of possession. On the contrary, they argue only that "knowledge of possession is NOT necessarily knowledge of an undisclosed claim of ownership by gift." Appellants' Brief at 20 (emphasis added). Thus,

---

[5] Our review of the record does not reveal any evidence to support Appellants' contention that their awareness of Morris's possession of the disputed items was an issue of material fact.

Appellants essentially argue Morris failed to provide them notice of his ownership of the disputed items.[6] We, however, need not decide whether disclosure by Morris occurred here. For purposes of establishing undue delay under laches, it is sufficient that Appellants were aware of Morris's possession of the disputed items at time of Decedent's death in 1990. Indeed, even if they were unaware of Morris's possession of the items at the time of Decedent's death, they certainly were put on notice with respect to the disputed items when the executors filed the inventory on June 19, 1990.[7] Nonetheless, despite their awareness of Morris's possession, it was not until March 2011, when Appellants petitioned the orphans' court to order Morris to file an account of the estate.

Here, the orphans' court recounted the following undisputed facts of record:

> First, [Appellants] admit in their depositions testimony and sworn declarations, that they were aware, both before and after Decedent's death, that [Morris] was in possession of most of the Disputed Items. Second, [Morris's] co-executor, [James], took a position as [e]xecutor on [t]ax filings and [i]nventory regarding the tangible personal property that was included in the [e]state and did not include these Disputed Items. Third, [Appellants] never objected to [Morris's] possession of the Disputed Items

---

[6] To buttress this point (lack of disclosure), Appellants refer to Mary's and James's sworn declarations and Susan's and James's depositions.

[7] "[A] function and object of an inventory is to fix presumptively the existence of property in the fiduciary's possession, and, while the listing therein does not affect true ownership, it is *prima facie* evidence of ownership.'" **In re Hendrickson's Estate**, 130 A.2d 143, 146 (Pa. 1957). The inventory lists property belonging to the estate that is under the control of the executor.

until 2010. Fourth, [Appellants] did not demand an accounting until nearly twenty-one years after Decedent's death.

Orphans' Court Opinion, 7/18/14, at 12. Given these undisputed facts, the court reasoned:

[Appellants] had an affirmative duty to inquire or object if they were concerned about the [e]state's interest in the Disputed Items, including making an inquiry regarding any missing items, now missing for more than 20 years. [James] in particular, as co-executor, had a duty to determine the nature, value and disposition of all of the assets of the [e]state, and repeatedly identified the assets of the [e]state on an inventory and [f]ederal and [s]tate tax returns, always without any reference to the Disputed Items. [Appellants] do not allege that [Morris] kept secret from them his possession of the assets. Indeed, [Mary] admits she knew [Morris] had possession of many of these items long before the Decedent's death.

*Id.* at 12-13. We, therefore, agree with the orphans' court's determination that Appellants are guilty of delay in instituting the instant action.

Appellants next argue the orphans' court erred in granting Morris's summary judgment motion because there existed issues of material fact regarding whether Morris suffered any prejudice because of Appellants' delay in instituting the action. Again, Appellants provide no record support to underscore their argument that disputed issues of material fact exist regarding whether Morris suffered prejudice because of the undue delay. Indeed, our review of the record yields no facts tending to negate the orphans' court's determination that Morris suffered prejudice as a result of Appellants' delay. Thus, we find no reason to disagree with the court's determination with respect to the prejudice element. As the orphans' court noted:

> [Appellants'] lengthy delay has inevitably impaired the ability of the parties to produce evidence regarding the claims of gifts made in the 1970s, the specific location or instructions regarding certain items of jewelry as to which none of the parties knows where they are or who had them last, and many other facts relating to these various items of tangible personal property.

*Id.* at 13. The orphans' court also noted that, to dispose of the instant matter, Morris relied on a 1991 in-court release,[8] which he and Appellants had executed with respect to the 1990 civil action. The court further noted that the transcript of the release was no longer available. In this regard, the orphans' court determined "[t]he fact that the transcript of the proceedings can now no longer be obtained and appears to have been lost or destroyed by all of the parties and their counsel, is another confirmation of the prejudice caused by the lengthy delay in this case." *Id.* at 14. Accordingly, given the circumstances here, the orphans' court did not err in concluding Morris suffered prejudice because of Appellants' delay in bringing this action. The court, therefore, did not err in granting Morris's summary judgment motion based on the equitable doctrine of laches.

---

[8] To memorialize the in-court agreement, the parties executed a **written** stipulation releasing Morris "of and from any and all claims arising out of [Decedent's estate] as well as from any and all claims which has been or could be brought on behalf of the [e]state for any acts or omissions involving [Morris and his wife] during the lifetime of [Decedent]." Orphans' Court Opinion, 7/18/14, at 14 (citing Stipulation and Agreement under docket nos. 1990-21209 and 1990-20688). The record also indicates that Mary separately executed a release in 2000, wherein she declared that "the co-executors have made distribution to her of all of the balance of the proceeds of the estate" and have "delivered to her the amount distributable to her." *Id.* (citing Receipt, Release, Waiver and Indemnity Agreement dated October 12, 2000).

To the extent Appellants cite ***In re Estate of Aiello***, 993 A.2d 283 (Pa. Super. 2010), to compel a different outcome, such reliance is inapposite. In ***Aiello***, decedent Donald Aiello died testate on March 27, 1977, leaving his entire estate to appellee, his wife. Under his will, he named appellee as executrix. Because appellee was not familiar with decedent's financial and business affairs and because English was not her native language, she renounced her right to serve as the executrix in favor of appellant, her husband's brother and successor executor under the will. In the summer of 2000, upon appellee's petition, the orphans' court directed appellant to file an accounting of his administration of decedent's estate. Upon the filing of the account, appellee filed objections, raising numerous allegations of self-dealing and breach of fiduciary duty on the part of appellant. The orphans' court sustained all but one objection.

On appeal, appellant argued, *inter alia*, that the orphans' court erred in failing to apply laches. In support of his argument, appellant pointed out that the active administration of the estate had ceased many years ago and that appellee's twenty-year delay in petitioning the court for accounting "was detrimental to him in that bank records and other records [had] been lost, memories [had] faded and his ability to piece together the specifics of his administration [had] been generally impeded." ***Aiello***, 993 A.2d at 287. Relying on the orphans' court's reasoning, we affirmed its ruling.

> The [orphans'] court concluded that [appellant] failed to prove that he had changed his position [to his detriment] as a result of the delay. Furthermore, the court found that [appellant] ***continued to actively administer the estate for***

> ***many years after decedent's death.*** For example, in 1997 he signed a deed, in his capacity as executor, transferring a parcel of property owned by the decedent. He signed liquor license renewals for a bar owned by the decedent in his capacity as executor until 1999, when the bar was sold. Additionally, there are 18 shares of St. Mary's common stock that continue to be held in the name of the estate.

***Id.*** (emphasis added). Accordingly, we concluded the orphans' court did not err in determining that laches did not bar appellee's claims. ***Id.*** Moreover, this Court observed in passing that the doctrine of unclean hands[9] also would bar laches. We remarked:

> [Appellant's] actions in this case require that he not be allowed to benefit from the delay. The evidence shows that [appellee] was unsophisticated in financial matters and relied heavily on her brother-in-law's advice, trusting him to act in her best interests. However, [appellant] repeatedly breached his fiduciary duty as executor, engaging in numerous transactions that had the effect of enriching himself to the detriment of the estate and, by extension, [appellee], the sole beneficiary of the estate.

***Aiello***, 993 A.3d at 287-88 (noting appellant continued to actively administer the estate for many years after decedent's death).

Instantly, there is no evidence of record to indicate that Morris actively administered the estate long after Decedent's death in 1990. The record reveals Morris's active administration of the estate essentially terminated in 1992, when he disposed of the estate's tax issues. Thereafter, there was a

---

[9] The orphans' court may invoke the doctrine of unclean hands *sua sponte*. ***In re Bosley***, 26 A.3d 1104, 1114 (Pa. Super. 2011). The decision to apply the unclean hands doctrine against a party is subject to review for abuse of discretion. ***In re Vincent J. Fumo Irrevocable Children's Trust ex rel. Fumo***, 104 A.3d 535, 539 (Pa. Super. 2014) (citation omitted).

general lull on the docket,[10] until Appellants filed the instant action in 2011. Thus, unlike the executor in ***Aiello*** who actively administered the estate for over twenty years, Morris did not actively administer the estate long after Decedent's death. Accordingly, the case *sub judice* is distinguishable from ***Aiello*** and, therefore, inapposite.

In sum, the orphans' court did not err in granting Morris's motion for summary judgment on the basis of laches, because Morris suffered prejudice as a result of Appellants' undue delay in bringing this action.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/11/2015

---

[10] The only notable actively that occurred on the docket was Mary's release dated October 12, 2000.