J-A13034-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE MATTER OF THE JANET C. KELSEY, CO-TRUST | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: MARIE SAGE KELSEY, CO-TRUSTEE | : : : : : : | |
| | : | No. 1876 EDA 2020 |

Appeal from the Order Entered August 19, 2020
In the Court of Common Pleas of Delaware County Orphans' Court at
No(s):  No. 0212-2019-0

BEFORE:   BENDER, P.J.E., DUBOW, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                 Filed: July 8, 2021

Appellant Marie Sage Kelsey (hereinafter "Sage") appeals from the Order entered in the Court of Common Pleas of Delaware County Orphans' Court on August 19, 2020, removing Sage as Co-Trustee of the Revocable Living Trust of Janet C. Kelsey and ordering Denham L. Kelsey (hereinafter "Denham") to serve as the sole trustee of the Trust upon consideration of the Petition by Beneficiaries to Remove Co-Trustee.  Following a careful review, we affirm.

The orphans' court detailed the facts and procedural history herein as follows:

> Settlor Janet C. Kelsey (Settlor) died on March 28, 2018. *See* Pet. By Beneficiaries to Remove Co-Trustee. Settlor was a resident of Delaware County, Pennsylvania. *Id*. On June 8, 2000,

---

[*] Former Justice specially assigned to the Superior Court.

Settlor, a Delaware County resident, executed a Declaration of Trust for the Revocable Living Trust of Janet C. Kelsey. *Id.*, Ex. A.; See P-1, 2. Denham, a resident of Tucson, Arizona, is Settlor's son and was named Co-Trustee and a Beneficiary of the Trust. *Id.* Sage is Settlor's daughter and was named Co-Trustee and a Beneficiary of the Trust. *Id.* Sage resides at 71 West Rose Valley Road, Wallingford, Delaware County, Pennsylvania. *See* Pet. by Beneficiaries to Remove Co-Trustee. Janet Penelope Reed (Penn), a Delaware County resident, is Settlor's daughter and is one of the two residuary beneficiaries of the Trust. *Id.*, Ex. A. Nancy Luc Kelsey (Nancy), of Pike County, Pennsylvania, is Settlor's daughter and one of two residuary beneficiaries of the Trust. *Id.*

In the Trust, Article FOUR, as amended, provides for the following distributions to Settlor's children upon Settlor's death:

A. Juliet Grey Kelsey (Grey), "... Settlor's daughter, shall receive the real property of the Trust estate located at 2512 Philadelphia Pike, Claymont, Delaware, outright and alone."

B. Sage, "...Settlor's daughter, shall receive the real property of the Trust estate located at 71 West Rose Valley Road, Wallingford, Pennsylvania, outright and alone."

C. Denham, "... Settlor's son, shall receive the real property of the Trust estate located at 73 West Rose Valley Road, Wallingford, Pennsylvania, outright and alone."

D. Penn and Nancy, "Settlor's daughters, shall receive the remainder of the Trust Estate (after above distributions), in equal shares."

*Id.*

Under Article FIVE of the Trust, if either Denham or Sage is "unwilling or unable to serve, then the remaining Appointee shall serve alone as Trustee." *See* Pet. by Beneficiaries to Remove Co-Trustee, Ex. A; *See* P-1. As Co-Trustees, Sage and Denham initially hired Robert Firkser, Esquire as their legal counsel related to the Trust. *Id.* However, Sage terminated her relationship with Firkser as Counsel, but Firsker continued to represent Denham regarding the Trust. *Id.*

Petitioners alleged that Sage took actions causing "extreme acrimony" between herself and them. *See* Pet. by Beneficiaries to Remove Co-Trustee. Sage's alleged actions made it impossible for Co-Trustees and Beneficiaries to interact; caused detriment to Beneficiaries' interests; and endangered the Trust and its interests. *Id.* Sage's alleged actions are as follows: self-dealing,

commingling of the assets, and general abdication of her responsibilities as Co -Trustee. *Id*.

Petitioners alleged specific certain acts that illustrated the aforementioned conduct. 71 West Rose Valley Road (Number 71) is a property that adjoins 73 West Rose Valley Road (Number 73). *See* Pet. by Beneficiaries to Remove Co -Trustee. Sage resides in Number 71. *Id*. Petitioners specifically alleged that Sage took actions to support her claim for Number 73 despite Article FOUR setting forth that Number 73 belonged to Denham. *Id*. Sage allegedly refused to allow Denham access to Number 73 as she took control of Number 71; changed the locks to both properties; failed to provide keys to Denham; and removed the street number from Number 73's door. *Id*., Ex. C, D, T.

Petitioners made additional allegations that Sage refused to account for or distribute the personal property in either property; did not provide information regarding insurance to Denham as to Number 73; modified the utilities to be under only Number 71 without Denham's consent; and allowed third parties to reside in Number 73 without Denham's consent. *Id*., Ex. C, E, F. In addition, Petitioners alleged that Sage, without legal counsel, has not spoken to Denham since April 21, 2018. *See* Pet. by Beneficiaries to Remove Co-Trustee.

Another specific alleged act was that Sage improperly interfered with Co-Trustees' timely payment and filing of the Pennsylvania Transfer Inheritance Tax Return. *See* Pet. by Beneficiaries to Remove Co-Trustee, Ex. G. Sage allegedly refused to approve pre-payment of the estimated tax requiring Penn and Nancy to loan money to the Trust to obtain the five percent discount and to make the payment within three months of Settlor's death. *Id*. Petitioners further alleged that Sage met with an appraiser to have Numbers 71 and 73 appraised to prepare the Inheritance Tax Return and that Sage failed to inform the appraiser of the existing written lease between her and Settlor for the sum of $1 per year rental causing a reduction in the appraised value. *Id*., Ex. F. Despite Denham's approval of the draft Inheritance Tax Return, Sage allegedly refused to sign it because the appraised value should have been reduced due to the alleged lease. Id., Ex. J, K. Due to Sage's alleged refusal, the Inheritance Tax Return could not be timely filed. *Id*.

Another alleged act by Sage was that she refused to approve a partial interim distribution to Nancy and Penn, the residuary beneficiaries, because if litigation ensues, then their share may be reduced by counsel fees. *Id*., Ex. F. Petitioners argued that if litigation ensues as to Number 73, then the residuary beneficiaries

would not be properly charged with counsel fees because they have no interest or stake in that property. *Id*., Ex. A, F. Another alleged act by Sage was that she made threats against Firkser in his capacity of representing Co Trustees. *Id*., Ex. B, F, L, J through 0. Sage allegedly refused to pay Firkser's legal fees and improperly informed the Appraiser not to communicate with him because he was no longer involved in the matter. *Id*.

Petitioners alleged that Sage improperly stated that Firkser was Denham's Counsel as Co-Trustee **and** Counsel for the Beneficiaries even though she knew Firkser was only Denham's Counsel as Co -Trustee. *Id*. Sage allegedly performed such acts to intimidate Petitioners, including threatening to file a disciplinary action against Firkser to get Denham and Counsel for the Beneficiaries to agree to mediation. *Id*., Ex. R, U.

In general, Sage denied that as Co-Trustee, she engaged in self-dealing and that she denied Denham access to Number 73 by locking him out of the Property. See Answer with New Matter to Pet. by Beneficiaries to Remove Co-Trustees. Sage denied that she failed to cooperate with Denham and averred that she wanted to mediate and resolve this matter. *Id*., Ex. F.

In response, Sage alleged that "Senior Informational Services," "an unlicensed "trust factory," prepared the Trust which was defective and redundant. *See* Answer with New Matter to Pet. by Beneficiaries to Remove Co-Trustees. The Company also prepared a "Pour Over Will" by which anything not already in the Trust was to be placed into the Trust upon Settlor's death. *Id*. According to the terms of the Trust, "friction" between co -trustees is not a condition warranting their replacement. *Id*. The Trust does not address whether there is a tie between Co-Trustees. *Id*. Sage averred that she has been and continues to be able and willing to serve as Co-Trustee. *Id*.

While alive, Settlor resided on one side of Number 71 for several decades while Sage and her daughter resided on the other side at Number 73. *See* Answer with New Matter to Pet. by Beneficiaries to Remove Co-Trustees. Sage alleged that Settlor executed a Codicil to her Will wherein she bequeathed the following:

> Penny: Any gifts given to her and Zoran and any books she may want.
> Grey: The mirror over Robert's desk
> Janet: Piano
> Nancy: All of Nancy's artwork, Robert's chair
> Denham: Esherick chair.

*Id*., Ex. 6. The Codicil left Sage all of Sage's pottery and artwork; Cilica; Alabaster lamp; Settlor's bed; Audubon prints; and "everything else along with the ability to give any item to whoever wants it." *Id*.

Sage argued that in light of all of the property at Number 71 was bequeathed to her, then Sage had every right to use it and prevent others from taking it, excluding the five above items. See Answer with New Matter to Pet. by Beneficiaries to Remove Co - Trustees. Sage alleged that Settlor knew that if she were to be put in a hospital or long-term care facility, then Sage's occupancy at Number 71 would be jeopardized. *Id*. Therefore, Settlor drafted a lease giving Sage the right to occupy Number 71 at least until 2020 for the yearly rent of $1.00. *Id*.; *See* Pet. by Beneficiaries to Remove Co-Trustee, Ex. T. Sage averred that Number 71 has one parcel number and tax I.D. number registered in Delaware County. *See* Answer with New Matter to Pet. By Beneficiaries to Remove Co-Trustees, Ex. 7.

Sage alleged that on June 8, 2000, Settlor signed a Quit Claim Deed prepared by Senior Information Services, conveying that one parcel to the Trust. *Id*., Ex. 2. Sage further alleged that Denham requested permission to establish a residence on the third floor of Number 73, but Settlor refused to allow him to do so. *See* Answer with New Matter to Pet. by Beneficiaries to Remove Co -Trustees. Settlor attempted to devise Number 71 for Sage and Number 73 for Denham. *Id*. Sage alleged that the division of the two properties' utilities are 70% completed and that one can still gain access to the other property through the basement or third floor. *Id*.

Sage agreed that she and Denham signed an engagement letter with Attorney Firkser. *See* Answer with New Matter to Pet. by Beneficiaries to Remove Co-Trustees, Ex. 8. Sage alleged that Firkser hired an appraiser to appraise Number 71 as of the date of Settlor's death, for the purposes of the Pennsylvania Income Tax Return, but did not inform the appraiser that Number 71 was subject to a lease for $1.00 per year to 2020. *See* Answer with New Matter to Pet. by Beneficiaries to Remove Co-Trustees. Sage further alleged that the appraisal report appraised it as a single family residence and did not reflect the fact that it was subject to a lease. *Id*., Ex. 9. Therefore, the Inheritance Tax Return did not reflect Number 71's true value. *Id*. A revised appraisal report was issued reflecting the existence of the lease. *Id*., Ex. 10.

As to the Pennsylvania Inheritance Tax Return, Sage alleged that over her objections, Firkser failed to take the Homestead Exemption and to include Denham's home address. *See* Answer

with New Matter to Pet. by Beneficiaries to Remove Co-Trustees. Sage further alleged that she disagreed with Firkser's resolution to draft the deed to subdivide Number 71 between Sage and Denham and that Firkser and Denham rejected the idea to convert the premises into condominiums. *Id*. Sage alleged that Attorney Foehl, Counsel for Beneficiaries, was constrained to accept the option of converting the premises into a condominium, but could not offer independent advice because although the conversion would benefit Denham, this option might result in less money for the residuary beneficiaries. *Id*.

Sage further alleged that Firkser was to liquidate an annuity to pay administration expenses in time to make a payment for the Inheritance Tax discount and did not open a Trust Account for these funds once received because Denham did not provide a home address which is required under the United States Patriot Act. *Id*. In addition, Sage alleged that Firkser failed to produce the Will to the Delaware County Register of Wills. *Id*.

Sage further alleged that Firkser invited the trust beneficiaries to his office to obtain funds for early payment of the Pennsylvania Inheritance Tax Return. *See* Answer with New Matter to Pet. by Beneficiaries to Remove Co-Trustees. Sage argued that the terms of the Trust indicate that only co-trustees make decisions as to the Trust's administration. *Id*. Sage alleged that at this meeting, Firkser disclosed information to the beneficiaries protected by attorney-client privilege. *Id*. Sage further alleged that during this meeting, Firkser compromised his ability to represent the co-Trustees. *Id*. In August 2018, Sage hired her own counsel who requested an Accounting from Firkser. *Id*.

Sage alleged that although Article Six of the Trust enables the Trust to make a loan or mortgage to any person, including her, to purchase Denham's interest, Denham ignored this provision and demanded that Sage "buy him out" of Number 71 for $142,500 even though he and her siblings knew that she could not do so without a mortgage. *See* Answer with New Matter to Pet. By Beneficiaries to Remove Co-Trustees.

Regarding access to Number 73, Sage alleged that she asked Denham to wait one week until she and her daughter returned from vacation because Number 71 and Number 73 were not entirely separate. *See* Answer with New Matter to Pet. by Beneficiaries to Remove Co-Trustees. Sage further alleged that in response, Denham threatened to shut down utilities. *Id*. Sage alleged that she only asked Denham to provide advance notice if

he wanted access to Number 73 and denied that she locked anyone out of the premises. *Id*.

Regarding mediation, Sage alleged that Denham refused to participate in mediation to resolve the disputes in this matter and to convert Number 71 into a condominium, at a cost of $8,000 to be paid to a real estate attorney. *See* Answer with New Matter to Pet. by Beneficiaries to Remove Co-Trustees. Sage argued that Denham refused again to engage in mediation. *Id*.

On February 27, 2019, Petitioners Denham, Penn and Nancy filed the Petition by Beneficiaries to Remove Co-Trustee and a Petition for Discovery. On March 28, 2019, Sage filed an Answer with New Matter to the Petition by Beneficiaries to Remove Co - Trustee. Petitioners, on April 16, 2019, filed Preliminary Objections to Sage's aforementioned Answer. Sage on May 2, 2019, filed a First Amended Answer with Cross-Claim to Petition by Beneficiaries to Remove Co-Trustee. On May 20, 2019, Sage filed a Petition for Discovery.

The parties appeared before the Honorable Kevin F. Kelly on these respective Petitions on May 20, 2019. The parties entered into an agreement on the record as to the discovery petitions. President Judge Kelly re-listed the matter for July 8, 2019 as to the remaining outstanding Petitions. On May 22, 2019, Petitioners filed Preliminary Objections to the First Amended Answer with Cross-Claim to Petition by Beneficiaries to Remove Co-Trustee, which Sage responded to on June 7, 2019.

On July 1, 2019, President Judge Kelly issued a Decree memorializing the Agreement regarding discovery. On July 8, 2019, the parties appeared before President Judge Kelly for a hearing on the outstanding Preliminary Objections on said Petitioners. On July 17, 2019, President Judge Kelly denied, without prejudice, Petitioners' Preliminary Objections to Respondent's First Amended Answer with Cross-Claim to Petition by Beneficiaries to Remove Co-Trustee. On the same date, President Judge Kelly denied Petitioners' April 16, 2019 Preliminary Objections to Respondent's Answer with New Matter as moot. On August 13, 2019, President Judge Kelly entered a Decree that all terms and conditions of the "Agreed Upon Working Relationship Between Co-Trustees of the Janet Kelsey Trust" be wholly adopted by court order.

This matter was re-assigned to the Trial Court. On August 18, 2020, the Trial Court held a hearing on the outstanding Petition to Remove the Co-Trustee. See generally (Notes of Testimony, "N.T." 08/18/20). At the beginning of the August 18, 2020 hearing, the Trial Court stated that following a conference

with the parties the day before the hearing, Counsel for Beneficiaries, including Denham, the Co-Trustee, the only remaining issue was the removal of Sage as Co-Trustee. *Id*. at 5. Sage's Counsel stated that Sage agreed with the Borough of Rose Valley's Zoning Board's Decision as to Number 71 and 73. *Id*. at 6. The Trial Court stated that the Zoning Board's Decision is irrelevant because whoever receives Number 73 must abide by the Zoning Board's Decision, and therefore, the issue of whether Sage should be removed as Co-Trustee remains the sole issue for it to decide. *Id*. at 7.

On behalf of the Beneficiaries, Denham Kelsey, Co -Trustee, testified. (N.T. 08/18/20 at 10). Denham testified that he resides in Arizona. *Id*. at 10, 64. Denham stated that his mailing address is 405 Wetmore Road 117-277, Tucson, Arizona 85705 and that he cannot get mail at his residence at 1602 Entrada Tercera, Tucson, Arizona 85718. *Id*. at 65-66. Denham identified the Working Relationship Agreement dated July 31, 2019, Exhibit P-23, between him and Sage. *Id*.; See P-23. Denham testified that this Agreement was generated through mediation. (N.T. 08/18/20 at 96). Denham testified that the Agreement was based upon the "review of personal property named in trust to attend the distribution." (N.T. 08/18/20 at 12). The Trust was established on June 8, 2000. Id. at 13. The Trust was amended on December 14, 2006. *Id*. at 14; See P-1, P-2. Settlor died on March 27, 2018. *Id*. at 15. It should be noted that the Agreement was signed a year and ½ after the Trust's establishment.

Denham testified that Firkser began his representation of him and Sage, as Co-Trustees, shortly after Settlor's death. (N.T. 08/18/20 at 15-16). For three or four months, Firkser represented the Co-Trustees until August 2018 when Sage terminated Firkser's representation of her. *Id*. at 16. Denham testified that unlike Sage, he, as Co -Trustee, is willing to pay Firkser's bill. *Id*. at 101-102. Denham admitted that Firkser has not been paid for his services because Sage refuses to release any money from the Trust. *Id*. at 102. Denham testified that there is $120,000 from the Trust in Firkser's escrow account which are available to pay expenses and to make distributions to the residuary beneficiaries. *Id*. at 104-105.

Denham testified that at the April 2018 meeting with Co-Trustees, Penn, and Firkser, he learned that Sage wanted to buy Number 73. *Id*. at 16-18. Denham further testified that he was willing to give Number 73 to Sage for half of the value of the entire Property (Number 71 and 73) because there are two equally sided structures separated by a wall. *Id*. at 20-21. Denham testified that

Sage agreed and stated that she would get a mortgage. *Id*. at 21-22. Denham further testified that Sage never got a mortgage. *Id*. As for a distribution from the Trust to Penn and Nancy, the residuary beneficiaries, Denham testified that Sage refused to do without giving a reason. (N.T. 08/18/20 at 22-23). Denham testified that Sage did not distribute the personal property. *Id*. at 23-24. This issue was again raised and became a part of the Working Relationship Agreement dated July 31, 2019. *Id*. at 39. Although Sage agreed under this Agreement to make the distributions, she failed to do so. *Id*. at 39. No distributions have been made to the residual beneficiaries to date. *Id*. at 41, 62-63. As to the Inheritance Tax Return, Denham testified that it was never filed because Sage refused to sign it whereas he found the Return to be acceptable. (N.T. 08/18/20 at 43-45, 63); *See* P-24.

Denham testified that he had to file a Petition for Contempt on December 11, 2019 in order to file the agreed-upon petition to the Borough of Rose Valley for a variance and subdivision approval of Number 71 and Number 73 because Sage would not sign the Petition for Approval. (N.T. 08/18/20 at 35). After Sage signed the Petition for Approval, Counsel for Denham withdrew the Contempt Petition and filed the Petition for Approval with the Borough. *Id*. at 35, 38.

As to Number 73, Denham testified that he changed the locks to Number 73 and gave a key to Sage. (N.T. 08/18/20 at 46). Denham further testified that following this lock change, Sage, in April 2018, changed the locks again to Number 73 and did not give him a key. *Id*. Denham testified that he did not have access to Number 73 until the execution of the July 31, 2019 Working Relationship Agreement and the August 13, 2019 Decree. *Id*.; See P-23. Denham admitted that he gave Sage one day's notice to let him into Number 73, but he believed that he did not need permission because he had a key allowing him to enter Number 73. (N.T. 08/18/20 at 92).

Denham testified that he contacted Firkser to inform Sage that in light of Number 73 being vacate[d], the utilities did not have to be on. (N.T. 08/18-20 at 93). Denham denied threatening to shut off the utilities for both Number 71 and 73 because the utilities are separate for each one. *Id*. Denham testified that the electricity got changed to the properties and that when he contacted the electric company, they refused to tell him the name on the account. *Id*. at 55.

Denham testified that he has not had any written contact with Sage since September 2019. (N.T. 08/18/20 at 99). Denham further testified that he has not had any oral contact with Sage

Denham testified that he is willing to speak with Sage. *Id*. at 100-101. Denham admitted that he called the Pennsylvania State Police to check Number 73 because Sage did not answer his calls or email correspondence as to Number 73 and Sage threatened to move people into Number 73. *Id*. at 93-94. Denham admitted that when he visited the Property, he knocked on Number 71's door, but did not enter inside. *Id*. at 95. Denham denied that a cat got loose on the aforementioned occasion. *Id*. Denham further testified that Sage did not provide any insurance information regarding Number 71 and 73. *Id*. at 49-51.

The parties stipulated that Sage removed the number 73 from the property of Number 73. (N.T. 08/18/20 at 56). Denham testified that Sage put the number 71 on the center of the Property and erased the numbers 71 and 73 from the mailbox. *Id*. Denham further testified that based on his observations, he believed that a third party resided on the third floor of Number 73, without his approval, after the Trust's execution and Settlor's death. *Id*. at 56-57, 59-60. Denham testified that since Settlor's death, he was inside Number 73 one or two times. *Id*. at 59. Denham testified that while Firkser represented both Co-Trustees, there was no indication prior to August 2018 that Sage had a lease for $1 for Number 71. (N.T. 08/18/20 at 61). Denham further testified that Sage subsequently raised this issue when she insisted it be included in the appraisal of the Property. *Id*.

On cross-examination, Denham testified that he had gotten along with Sage. (N.T. 08/18/20 at 68). Denham read the Codicil to the Trust and indicated the items of personal property that she was to receive. *Id*. at 69; *See* P-2. The Codicil states as follows:

> I do wish to thank my loving family for offering me a place in their homes, Penny in Rose Valley, Grey at Claymont, Nancy who would do anything, D in Tucson. However, if Sage has given me the privilege of being in my own home and being my own master. She has been ready to do anything I need or want, watching over me in sickness and health, being a tireless caregiver. Please take this into account when criticize [sic] her assets in being the youngest and able to have a say in what I would have wanted. She has my back at all times when I have been ill and unable to function and cared for me lovingly at all times.

*Id*.

Denham admitted that he has multiple email addresses, but denied that he has multiple names, including the name of "Maya

- 10 -

Kelsey." (N.T. 08/18/20 at 72-73). Denham testified that Maya Kelsey is his wife and that he may have given Firkser his wife's email address as a contact because they share that email address. *Id*. at 73. Denham denied having aliases or other identities. *Id*. at 76.

Denham testified that he and Sage went to PNC Bank to attempt to open a bank account for the Trust; however, the Bank did not have the ability for two signers on the withdrawals. (N.T. 08/18/20 at 76-77, 104). Denham further testified that he did not think Sage worked in accounting. *Id*. at 79. Denham testified that Sage no longer wanted Firkser to represent her because he allowed the beneficiaries to talk to him and to loan money to the Trust. *Id*. at 79-80, 82. Denham denied ever agreeing to the establishment of a bank account where only Sage's signature was required. *Id*. at 108-109. In addition, Denham testified that Sage objected to the way Firkser filed the Inheritance Tax Return. *Id*. at 82.

Denham testified that Sage objected as to how Firkser drafted a deed for Number 71 and 73 which partitioned the Property. (N.T. 08/18/20 at 83-84). Denham further testified that this action was in accordance with what the Settlor wanted and that such action was done before on Rose Valley Road. *Id*. at 84. Denham testified that a court order was issued to partition the Property and that he signed the application submitted to the Zoning Board. *Id*. at 84. Denham further testified that Sage eventually signed the application as well. *Id*. at 85. Denham testified that Firkser informed him that Sage wanted to mediate this matter sub judice, but there was nothing to mediate. (N.T. 08/18/20 at 89).

Sage testified that she was always to get Number 71 and that she worked for her family during her entire life. (N.T. 08/18/20 at 127). Sage admitted that she has a dispute over Number 73 with Denham and that Settlor wanted the Property divided. *Id*. at 131-132. Sage testified that she never discussed Settlor's intention of dividing the Property (Number 71 and Number 73) to Firkser. *Id*. at 140. Sage further testified that she wanted Settlor's intention to be followed. *Id*. Sage further testified that the Trust allows her to take a loan from the Trust and buy out Denham of the Property, but that option was rejected. *Id*. at 128, 133. Sage believed the loan would come from the residuary beneficiaries' share of the Trust. *Id*. at 133-134. Sage testified that she did not know if receipt of the loan from the Trust constituted a conflict because she is one of the Co-Trustees. *Id*. at 134.

- 11 -

Sage testified that she has an Associate's Degree in Accounting and worked as a Tax Examiner for the IRS. *Id*. at 127. Sage testified that she agreed to Firkser representing her and Denham to keep the peace. (N.T. 08/18/20 at 129-131). Sage testified that she discussed with Firkser that Number 71 and 73 [sic]. *Id*. at 140. Sage further testified that she did not agree with Firkser on the partitioning of the Property because she owned real estate and knew that one cannot divide a property through the signing of a lease or creation of a deed, which is what Firkser wanted to do. *Id*. at 114, 140. Sage testified that she was in agreement with the Borough's Zoning Hearing Board's decision as to Number 71 and Number 73. *Id*. at 71.

Sage testified that she presented a copy of the lease to Firkser wherein she was permitted to lease Number 71, including the whole third floor, until the end of 2020. (N.T. 08/18/20 at 118). Sage further testified that Firkser told her that it did not matter. *Id*. at 118. Sage stated that the lease affected the appraisal of the Property. *Id*. at 119.

Sage testified that she never changed the locks to Number 73 and that Denham had a key to Number 73. (N.T 08/18/20 at 138). Sage admitted that she changed the locks to Number 71 because her cat got out while she was on vacation and Denham was in town. *Id*. at 138.

Sage testified that she was Settlor's caregiver for her entire life and that she never had a tenant on the third floor because her daughter lived there. (N.T. 08/18/20 at 126, 137). Sage further testified that the third floor has always been included in Number 71. *Id*. at 126, 137, 148, 150. Sage testified that Denham threatened to shut off the utilities, including the third floor. *Id*. at 126, 137.

Sage testified that she was present at all of the hearings in this matter; produced all of the necessary documents; and participated in mediation efforts. (N.T. 08/18/20 at 126-127). Sage further testified that since August 2018, there has been one written communication with Denham regarding not visiting in the fall and that he did not need a dehumidifier. *Id*. at 151-152. Sage testified that Denham has not contacted her and admitted that she has not contacted him. *Id.* at 153.

Sage testified that the Trust gave her the personal property in the Property and that the William White artwork was taken from the Property. (N.T. 08/18/20 at 120). Sage testified that Denham previously stated that all personal property was to remain at the Property. *Id*. at 120. Sage further testified that she contacted

Denham about the missing artwork and that Denham returned the artwork. *Id*. at 120.

Sage testified that Firkser scolded her for wanting to read a document before she signed it and told her to get another attorney. (N.T. 08/18/20 at 115). Sage further testified that Firkser accused her of costing the Trust money because of missing the deadline for the discounted Inheritance Taxes. *Id*. at 115. Sage testified that she took the steps necessary to get the discount by following Firkser's directions. *Id*. at 116. Sage further testified that Firkser's administration of the Trust caused other excess expenses, including the late payment of the Property's tax bill in which foreclosure was threatened. *Id*. at 125.

Sage testified that the loan from the residuary beneficiaries was not necessary and that she was not informed about Firkser meeting with them. (N.T. 08/18/20 at 116). Sage further testified that she did not know about this loan until after it occurred. *Id*. at 154. Sage testified that Denham expressed an interest in Number 73's third floor to Settlor. *Id*. at 117. The parties stipulated that there was an agreement between Denham and Sage for Sage's daughter to use Number 73's third floor for a mutually agreeable time, also considering the partition action ramifications. *Id*. at 116-117. Sage testified that she did not recall all the beneficiaries going through the Property at any time. *Id*. at 123.

Sage testified that in preparation of the Inheritance Tax Return, she contacted Guy Matthews to prepare it. (N.T. 08/18/20 at 121). Sage testified that she thought it was filed. *Id*. at 154. Sage further testified that she paid all of the bills and the maintenance for Number 71 and Number 73. *Id*. at 121-122. As for the Borough of Rose Valley's Zoning Hearing Board proceedings, Sage testified that the paperwork submitted was not done correctly. *Id*. at 122-123.

Sage testified that Denham offered to let Sage buy him out of the Property for $140,000. (N.T. 08/18/20 at 124). Sage further testified that when she went to get a loan, the bank told her that unless the Property was already an income producing property, she could not get a loan. *Id*. at 124, 136-137. Sage testified that she did not want to sell the Property and receive ½ of the proceeds because she operates a day care center which attracts clients based on the address of the Property. *Id*. at 124-125. Sage further testified that if she moved elsewhere, she would lose her business. *Id*. at 125.

Sage admitted that she is not in agreement with an interim distribution to the residuary beneficiaries until the Estate is settled which the Trust provides. (N.T. 08/18/20 at 144). In addition,

> Sage testified that the residuary beneficiaries have already received monies from the Trust. *Id*. Sage admitted that she had the utilities mail the bills for Number 73 to Number 71 because she was tired of getting junk mail and believed that Denham should set up his own mailbox for Number 73. *Id*. at 148.
>
> At the hearing's conclusion, the Trial Court entered the Decree removing Sage as Co-Trustee. (N.T. 08/18/20 at 157). Sage's Appeal timely followed.

Orphans' Court Opinion filed 10/29/20, at 1-20 (emphasis in original).

On August 24, 2020, Sage filed a notice of appeal. On September 8, 2020, the orphans' court ordered Sage to file a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b). Sage filed the same on September 24, 2020. In her brief, Sage presents the following Statement of the Questions Involved:

> Did the factual evidence at the hearing on August 18, 2020, support the findings of the court that Marie Sage Kelsey engaged in conduct prohibited by 20 Pa.C.S.A. § 7766?
>
> Did the lower court misapply substantive law to the facts of the case in failing to recognize that friction among co-trustees is not sufficient reason to dismiss any one trustee, especially when the settler anticipated the possibility of such friction?
>
> Did the lower court have jurisdiction in this matter, in light of the FOURTH ORDER EXTENDING THE THIRTY-SECOND (32ND) JUDICIAL DISTRICT'S PAST DECLARED EMERGENCY, issued on July 8, 2020 and suspending operation of the court until October 31, 2020.

Brief for Appellant at 3-4 (capitalization in original). As the orphans' court's jurisdiction over this matter is dispositive of her appeal, we will consider Sage's final issue first.

- 14 -

In her brief, Sage states she is "willing to admit that 'lack of jurisdiction' is the weakest argument to support grounds for vacating the lower court order, but the issue cannot be waived [because] [t]he question of jurisdiction may be raised at any stage of the proceedings." Brief for Appellant at 22-23. To the contrary, upon review, we find that this claim is really a challenge to the orphans' court's power to act under the circumstance rather than a challenge to its subject matter jurisdiction; Sage's argument does not challenge the competency of the orphans' court to hear and decide the type of controversy before it, but rather asserts that it had done so prematurely. *See In re Melograne*, 812 A.2d 1164, 1166-67 (Pa. 2002) (discussing the distinction between a challenge to a court's subject matter jurisdiction which is not waivable and a challenge to a court's "authority, or power, to act" which is waivable).

First, the record is devoid of any objection by Sage either prior to or at the outset of the August 18, 2020, hearing pertaining to the orphans' court's decision to hold the hearing based upon an argument that the fourth order extending the thirty-second judicial district's past declared emergency deprived it of jurisdiction to do so.

> Our Pennsylvania Rules of Appellate Procedure and our case law provide the well-established requirements for preserving a claim for appellate review. It is axiomatic that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). "The absence of a contemporaneous objection below constitutes a waiver" of the claim on appeal. *Commonwealth v. Powell*, [ ] 956 A.2d 406, 423 ([Pa.] 2008); *Tindall v. Friedman*, 970 A.2d 1159, 1174 (Pa. Super. 2009)

- 15 -

("On appeal, we will not consider assignments of error that were not brought to the tribunal's attention at a time at which the error could have been corrected or the alleged prejudice could have been mitigated.") (citation omitted)).

**Commonwealth v. Rodriguez**, 174 A.3d 1130, 1144–45 (Pa.Super. 2017).

Importantly, where, as here, an appellant includes an otherwise waived issue in his or her Pa.R.A.P. 1925(b) statement, such inclusion will not "resurrect" that claim. **Id.** at 1145 n.6 (citing **Steiner v. Markel**, 600 Pa. 515, 968 A.2d 1253 (Pa. 2009)).

Moreover, Sage did not ensure that the referenced "Fourth Order" was included in the certified record for this Court's consideration.[1]

> The fundamental tool for appellate review is the official record of the events that occurred in the trial court. To ensure that an appellate court has the necessary records, the Pennsylvania Rules of Appellate Procedure provide for the transmission of a certified record from the trial court to the appellate court. The law of Pennsylvania is well settled that matters which are not of record cannot be considered on appeal. Thus, an appellate court is limited to considering only the materials in the certified record when resolving an issue. In this regard, our law is the same in both the civil and criminal context because, under the Pennsylvania Rules of Appellate Procedure, any document which is not part of the officially certified record is deemed non-existent—a deficiency which cannot be remedied merely by including copies of the missing documents in a brief or in the reproduced record. ... Simply put, if a document is not in the certified record, the Superior Court may not consider it.

---

[1] In her brief, Sage cites only to "Rule 1952" as relating to the authority given to President Judges where the Supreme Court declares a judicial emergency. Brief for Appellant at 71. At oral argument, counsel admitted that the order is not contained in the certified record, but indicated he was unable to inspect the record due to restrictions resulting from the COVID-19 pandemic.

*Commonwealth v. Preston,* 904 A.2d 1, 6-7 (Pa.Super. 2006) (citations omitted). "Our law is unequivocal that the responsibility rests upon the appellant to ensure that the record certified on appeal is complete in the sense that it contains all of the materials necessary for the reviewing court to perform its duty." *Id.* at 7.  Thus, the failure by an appellant to ensure that the original record for appeal contains sufficient information to conduct a proper review constitutes a waiver of the issues sought to be examined. *Id.*

In light of all the foregoing, we find Sage has waived the third issue she presents for this Court's review.[2]

As Sage's remaining two claims are interrelated, we will consider them together.  Sage initially states the evidence at the August 18, 2020, hearing was insufficient to support the orphans' court's finding that she had engaged in conduct prohibited by 20 Pa.C.S.A. § 7766.  She further posits the orphans' court erroneously based its decision to dismiss her as trustee on the existing friction between Denham and her.  She reasons this is especially so since the

---

[2] The orphans' court found no merit to this issue and in doing so stated that nothing in the Order prevented the Orphans' Court division of the Delaware County Court of Common Pleas from holding hearings during the COVID-19 public health crisis.  To the contrary, the orphans' court clarified that with the exception of civil and criminal jury trials, the Delaware County Court of Common Pleas continued to operate by holding hearings *via* telephone and/or other electronic means. Orphans' Court Opinion, filed 10/29/20, at 22-23.  It is well-established that this Court may affirm the trial court's order on any valid basis. *Plasticert, Inc. v. Westfield Ins. Co*., 923 A.2d 489, 492 (Pa.Super. 2007).

Settlor, Ms. Kelsey, anticipated there would be friction between the beneficiaries/siblings, who are also Ms. Kelsey's children. Brief for Appellant at 23-48.

Generally, in a civil action, a reviewing court must examine the record in the light most favorable to the verdict winner to determine "whether the evidence was sufficient to enable the factfinder to find that all the elements of the causes of action were established by a preponderance of the evidence." *In re Vencil*, 638 Pa. 1, 14, 152 A.3d 235, 243 (2017) *citing* **Samuel– Bassett v. Kia Motors Am., Inc.**, 613 Pa. 371, 34 A.3d 1, 34 (2011). In an appeal from an Orphans' Court decree:

> [we] must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of that discretion. However, we are not constrained to give the same deference to any resulting legal conclusions. Where the rules of law on which the court relied are palpably wrong or clearly inapplicable, we will reverse the court's decree.

*In re Estate of Brown*, 30 A.3d 1200, 1206 (Pa.Super.2011) (citation omitted).

The Orphans' Court's decision to appoint or remove a trustee is subject to review for abuse of discretion. *In re Croessant's Estate*, 482 Pa. 188, 393 A.2d 443, 446 (1978); *Holmes Trust*, 392 Pa. 17, 139 A.2d 548, 551 (1958) ( "the court may remove a trustee if his continuing to act as trustee would be detrimental to the interests of the beneficiary. The matter is one for the exercise of a reasonable discretion by the court"); *In Re Taylor's Estate*, 320 Pa. 1, 181 A. 482, 483 (1935) (appointment of successor trustee would not be disturbed on appeal in absence of abuse of discretion).

*In re Vincent J. Fumo Irrevocable Children's Tr. ex rel. Fumo*, 104 A.3d 535, 539 (Pa.Super. 2014).

Pa.C.S.A. §§ 7766 relating to the removal of a trustee reads, in relevant part:

> **(a) Request to remove trustee; court authority.--**The settlor, a cotrustee or a beneficiary may request the court to remove a trustee or a trustee may be removed by the court on its own initiative.
>
> **(b) When court may remove trustee.--**The court may remove a trustee if it finds that removal of the trustee best serves the interests of the beneficiaries of the trust and is not inconsistent with a material purpose of the trust, a suitable cotrustee or successor trustee is available and:
>
> > (1) the trustee has committed a serious breach of trust;
> >
> > (2) lack of cooperation among cotrustees substantially impairs the administration of the trust;
> >
> > (3) the trustee has not effectively administered the trust because of the trustee's unfitness, unwillingness or persistent failures; or
> >
> > (4) there has been a substantial change of circumstances. A corporate reorganization of an institutional trustee, including a plan of merger or consolidation, is not itself a substantial change of circumstances.

20 Pa.C.S.A. §§ 7766 (a), (b). "The JSGC comments to section 7766 provide that its 'grounds for removal assume an active inquiry and findings by the court.' 20 Pa.C.S. § 7766, JSGC Comment—2005." *Trust Under Agreement of Taylor*, 640 Pa. 629, 647, 164 A.3d 1147, 1158 (2017).

Herein, the orphans' court stated the following:

In this matter, the evidence of Sage's conduct as Co-Trustee of the Trust satisfied Section 7766(b) of Title 20's requirements regarding (1) the lack of cooperation among co-trustees substantially impairs the administration of the trust and (2) as the co-trustee, Sage has not effectively administered the trust because of her unfitness, unwillingness or persistent failure. Therefore, the [orphans'] [c]ourt properly removed Sage as a Co-Trustee.

The evidence showed that there was more than mere friction between Sage and Denham, the Co-Trustees, and the beneficiaries. The Record is clear that there was severe hostility between Sage and Denham and Sage and the beneficiaries, and therefore, the [orphans'] [c]ourt's removal of Sage, as Co-Trustee, was justified because her conduct jeopardized the proper administration of the Trust.

The [orphans'] [c]ourt found Denham to be credible. The [orphans'] [c]ourt did not find Sage to be credible. As to Sage's actions regarding the ineffectiveness in the administration of the Trust, Denham testified as follows: Sage was unwilling to pay for Firkser's services as to the Trust. Sage refused to release an interim distribution to the residuary beneficiaries. Sage failed to distribute the personal property despite her agreement to do so under the Working Relationship Agreement. Sage refused to sign the Inheritance Tax Return, and therefore, it was never filed. (N.T. 08/18/20 at 15-16, 22-24, 39, 41, 43-45, 62-63, 101-102, 104-105); *See* P-24. In addition, Sage initially refused to sign the Petition for Approval to the Borough of Rose Valley to obtain a variance and subdivision approval of Number 71 and 73. *Id*. at 35, 38. Sage's refusal required Denham's Counsel to file a Petition for Contempt; however, that Petition was withdrawn once Sage finally agreed to sign the Petition for Approval. *Id*.

As to Number 73, Denham testified as follows: After Denham changed the locks and gave Sage a key to Number 73, Sage changed the locks again to Number 73 and did not give Denham a key to the property he was given under the Trust. Sage denied Denham access to Number 73 for 1 year and four months until the execution of the July 31, 2019 Working Relationship Agreement and the August 13, 2019 Court Decree. (N.T. 08/18/20 at 46); *See* P-23. There is no dispute that Sage removed the number 73 from the property of Number 73. (N.T. 08/18/20 at 56). In addition, Sage put the number 71 on the center of the Property and erased the numbers 71 and 73 from the mailbox. *Id*. In addition, Sage, at first, refused to apply for the partitioning the Property despite the entry of a court order; however, she

eventually signed the application to the Borough of Rose Valley Zoning Board. *Id*. at 84.

As for communication between the co-trustees, despite being willing to speak to Sage, Denham has not had any written contact with Sage since September 2019 and that he has not had any oral contact with Sage since August 2018. (N.T. 08/18/20 at 99-101). Denham had to call the Pennsylvania State Police to check Number 73 because Sage did not answer his calls or email correspondence as to Number 73 and Sage threatened to move people into Number 73. *Id*. at 93-94. In addition, Sage refused to provide insurance information to Denham regarding Number 73. *Id*. at 49-51.

As previously stated, the [orphans'] [c]ourt did not find Sage to be credible. The Record is clear that Sage took steps that thwarted the proper administration of the Trust as a result of the aforementioned hostile actions toward Denham, the Co-Trustee, and the beneficiaries. These are just a few of the actions that Sage took during the Trust's Administration. Sage missed the deadline to get the discount on the Inheritance Taxes. Sage further admitted that even though the residuary beneficiaries provided a loan to the Trust to pay the Inheritance Taxes, she refused to provide an interim distribution to the residuary beneficiaries until the Estate is settled. *Id*. at 116, 144, 154. Sage admitted that she had the mail regarding the utilities to Number 73 forwarded to her and that she believed that Denham should have set up his own mailbox. *Id*. at 148. Sage's unwillingness to buy out Denham of Number 73 or to sell the entire property and split the proceeds in half. *Id*. at 124-125, 128, 133, 136-137. Finally, Sage admitted that since August 2018, there has been only one written communication with Denham regarding not visiting in the fall and that there has been no oral contact between her and Denham. *Id*. at 153.

The [orphans'] [c]ourt found that the terms of the Trust are clear, especially as to the ownership of Number 71 and Number 73. Sage owns Number 71 and Denham owns Number 73. However, Sage clearly did not agree with the Settlor's aforementioned wishes. The Record is clear that Sage has taken every step possible to make the Co-Administration of the Trust impossible. This situation is well beyond mere friction between the Co-Trustees. Inheritance Taxes have not been paid. For the Co-Trustees to administer the Trust, a working agreement had to be executed and approved by the Court. An application had to be filed with the Borough's Zoning Hearing Board to partition the Property.

> The Co-Trustees have not communicated with each other since 2018.
>
> Sage testified that the Trust provided "word for word" that she could obtain a loan from the Trust. (N.T. 08/18/20 at 134). However, upon review, the [orphans'] [c]ourt was unable to locate any such language in the Trust. Furthermore, Sage never identified such provision. The Settlor's intent was for Sage to inherit Number 71. Therefore, it would be outside the Settlor's intent to provide such a provision.
>
> Sage's actions have effectuated Denham not receiving his share of the Trust, Number 73, and the residuary beneficiaries not receiving any distributions. By allowing Sage to remain a Co-Trustee with her bitter feelings as to the Settlor's distribution of the Trust's Assets, especially as to Number 73, the [orphans'] [c]ourt would be improperly jeopardizing the Settlor's wishes from ever being effectuated. Therefore, the removal of Sage as Co-Trustee was proper.

Orphans' Court Opinion, 10/29/20, at 27-31.

Sage devotes much of her lengthy argument to a discussion of caselaw relating to petitions to remove a trustee and of other sanctions available to an orphans' court which are less severe than the removal of a trustee. Sage maintains that the removal of a trustee is not mandatory, and since it is a drastic remedy, a court is limited in its ability to do so. **See** Brief for Appellant at 26-35. Sage stresses that Ms. Kelsey anticipated friction between her children as was evidenced by the language she used in her codicil to the trust, and that the orphans' court cannot remove her as a trustee simply because she "did not get along" with the others. **Id**. at 40. Sage reasons that the orphans' court has substituted its judgment for the express terms of the trust in numerous instances. **Id**. at 45-46.

Notwithstanding the foregoing, Sage acknowledges that the orphans' court provided twenty reasons for its removal of Sage as co-trustee. *Id*. at 47; **see supra**. Sage argues that even if this Court were to find no abuse of discretion, the testimony and exhibits introduced at the hearing did not present clear and convincing evidence to support her removal. Sage further posits that even were we to accept the orphans' court's finding that Sage's testimony was not credible, that of the other testifying witnesses and the documentary evidence support her position that the orphans' court applied the "wrong law." *Id*. Sage proceeds to discuss those places in the record where she believes the other witnesses bolstered her testimony. *Id*. at 50-70.

We have reviewed the entire record, including the transcript of the August 18, 2020, proceedings. In doing so, we remain mindful that we must defer to the orphans' court's factual findings that are supported by the evidence and to its credibility determinations absent an abuse of discretion. *In re Estate of Brown*, 30 A.3d 1200, 1206 (Pa.Super. 2011). Following our review, we find nothing in the record aside from Sage's own testimony to merit overturning the orphans' court's determinations regarding the credibility and weight of evidence presented before it – which determinations are within its exclusive province. The record furnishes more than adequate support for the orphans' court's factual findings and credibility determinations. To conclude otherwise would require us to reweigh the evidence, something this Court cannot do. *See Ferko-Fox v. Fox*, 68 A.3d 917, 928 (Pa.Super. 2013) ("This

court must defer to the trial court's determinations regarding the credibility of witnesses at the hearing.").

Finding no abuse its discretion, we affirm the orphans' court's August 18, 2020, Order.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/8/21